Michael Schiavone & Sons, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 32222.   Filed December 12, 1956.

*Raymond F. Garrity, Esq.,* and *Carl A. Phillipps, Esq.,* for the petitioner.
*William V. Crosswhite, Esq.,* for the respondent.

#### OPINION.

Murdock, *Judge:* The Commissioner has disallowed the petitioner's claims for excess profits tax relief under section 722 (b) (4) for each of the fiscal years ended February 28, 1941 through 1945. The evidence was heard by a commissioner of this Court and his proposed findings of fact have been served upon the parties. The petitioner did not file any proposed findings of fact as required by Rule 48 of the Rules of Practice of the Tax Court but has taken exception in its brief to some of the findings of fact proposed by the hearing commissioner and has asked for a number of specific facts which it claims have been omitted from those proposed findings. Apparently the petitioner has overlooked the hearing commissioner's first proposed finding of fact incorporating the stipulated facts in their entirety. The exceptions and requests of the petitioner have been considered but the Court adopts as its findings of fact the proposed findings of the hearing commissioner.

The petitioner commenced business during the base period and its base period net income does not reflect any operations for the first year and a half of that period. The actual earnings of the petitioner during the base period were $914 for the 6 months ended February 28, 1938, $296 for the fiscal year 1939, and $11,168 for the fiscal year 1940. The Commissioner of Internal Revenue, however, has computed the excess profits credit for the fiscal years 1941 and 1942 under the growth formula of section 713 (f) and for the years 1943, 1944, and 1945 under the invested capital method provided by section 714, and the absence of earnings for the first year and a half does not detract from those credits. The following table shows for each taxable year the excess profits net income, the excess profits credit, and

the excess profits tax liability as determined by the Commissioner of Internal Revenue:

| Year | Excess profits net income | Excess profits credit | Excess profits tax liability |
|---|---|---|---|
| Feb. 28, 1941 | $16,790.85 | $5,528.65 | $1,499.45 |
| Feb. 28, 1942 | 78,652.06 | 8,433.75 | 25,848.24 |
| Feb. 28, 1943 | 25,590.56 | 12,069.06 | 7,669.35 |
| Feb. 29, 1944 | 32,283.70 | 12,977.50 | 12,214.16 |
| Feb. 28, 1945 | 30,557.25 | 14,702.21 | 5,006.06 |

The petitioner contends that a fair and just amount representing normal base period earnings, arrived at by the application of the push-back rule under section 722 (b) (4), would be not less than $36,725.13. The evidence falls far short of supporting any such figure.

The petitioner argues that its failure to reach a normal level of earnings by the end of the base period was due to procurement problems which would have been corrected by the end of the base period if it had commenced business 2 years earlier than it did, that is, it would have been able to establish more contacts with scrap collectors and would have been able to enter into more contracts for obtaining industrial scrap.

The petitioner commenced business with well established contacts in the industry. Its management was experienced in the business. It had adequate equipment and financial support and a ready outlet for its scrap. The investment of the petitioner in physical properties increased only $6,426 from 1937 to the end of the base period. The evidence does not show that the petitioner's business was restricted at any time by lack of plant capacity, sources of procurement, or outlets for its products. It began business on September 1, 1937, but its founder, Michael Schiavone, had been in the scrap metal business in the same territory for a number of years as a part owner of Spencer Corporation and when he left Spencer Corporation he took with him two-thirds of its assets.

The evidence is that there was sufficient scrap available in the petitioner's trade area to supply whatever volume of business it could handle profitably. The petitioner's witnesses testified that the volume at which scrap moved to dealers like the petitioner and through them to their customers depended largely upon the prevailing market prices for scrap, that is, as the demand for scrap metal increased, prices increased and scrap was made available to the dealers. This is borne out by the experience of the petitioner during the base period.

The average costs and selling prices per ton of scrap in the case of the petitioner during the base period were as follows:

| Fiscal year | Average purchase price | Average selling price |
|---|---|---|
| Feb. 28, 1938 | $10.60 | $13.25 |
| Feb. 28, 1939 | 7.68 | 11.15 |
| Feb. 29, 1940 | 9.58 | 13.25 |

The scrap prices for other periods are not shown, but there is no reason to believe that the prevailing market prices for scrap would have been any different had the petitioner commenced business 2 years earlier.

The sales in tons made by the petitioner during the base period were as follows:

| | Fiscal year ended— | | |
|---|---|---|---|
| | Feb. 28, 1938 | Feb. 28, 1939 | Feb. 29, 1940 |
| March | | 2,082 | 3,149 |
| April | | 2,706 | 2,494 |
| May | | 2,438 | 3,257 |
| June | | 1,473 | 3,167 |
| July | | 1,937 | 1,654 |
| August | | 1,674 | 4,310 |
| September | 2,686 | 964 | 2,715 |
| October | 5,245 | 1,773 | 3,393 |
| November | 2,142 | 2,743 | 1,957 |
| December | 2,892 | 3,354 | 3,303 |
| January | 2,690 | 1,952 | 3,182 |
| February | 4,159 | 2,401 | 2,086 |
| Total | 19,814 | 25,497 | 34,667 |

The petitioner's sales in tons for the first 6 months of its existence, totaling 19,814, when the prices were high, were higher than its sales for any other 6 months during the base period, when the prices were lower. The sales for the first 6 months of the fiscal year ended February 29, 1940, amounted to 18,031 tons and those for the last 6 months of that same period were 16,636 tons. The net sales of the petitioner, expressed in dollars, were $262,873 for its first 6 months, $284,227 for the next 12 months, and $459,526 for the last 12 months of its base period. The fact, as stated previously, that it made relatively larger profits on lesser sales in 1940 as compared to its first 6 months of existence, was due, apparently, to the greater difference in the latter period between cost and sales prices of scrap.

The largest sales of the petitioner for any month during the base period occurred in the second month of its existence. Its sales dropped off substantially during the fiscal year ended February 28,

1939, when the prices for scrap were unfavorable. They improved somewhat in the next year when the prices were more favorable. The evidence does not show a steady growth or any growth of the petitioner's business during the base period. Its sales merely fluctuated and were poorer at the end than they were at the beginning. The indications from this record are that there would not have been any substantial increase in the volume of the business of the petitioner or a higher level of earnings at the end of the base period if it had commenced business 2 years earlier.

The tax of the petitioner for each taxable year computed under subchapter E was not excessive and discriminatory within the meaning of section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*