THE GREEN LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33248. Filed August 13, 1959.

*Carl J. Batter, Esq.,* for the petitioner.

*Arnold I. Weber, Esq.,* and *Donald W. Geerhart, Esq.,* for the respondent.

FORRESTER, *Judge:* Respondent has disallowed claims filed by petitioner seeking relief under section 722 of the Internal Revenue Code of 1939 in respect of excess profits taxes for the calendar years 1940, 1941, and 1942. The sole issue is whether respondent erred in denying to petitioner a constructive average base period net income resulting in the relief sought.

### FINDINGS OF FACT.

The stipulated facts are so found.

Petitioner, a Delaware corporation, was organized on September 7, 1937. Its principal office and place of business has at all relevant times been in Laurel, Mississippi. Its books and records are kept on an accrual method of accounting. Its income and excess profits tax returns for the years in question were filed in accordance with such method and on a calendar year basis with the then collector of internal revenue at Jackson, Mississippi.

Petitioner was organized upon the voluntary liquidation of Eastman, Gardiner and Company (hereinafter called E-G) by certain stockholder-creditors who desired to operate the finished lumber phase of E-G's business and, upon formation, petitioner acquired E-G's operating assets related thereto.

The foregoing assets included facilities for operating a lumber concentration yard and for the production of oak flooring, boxes, lath, and prefabricated, portable, demountable buildings for camps of the Civilian Conservation Corps (hereinafter called CCC). Petitioner continued to operate the facilities so acquired. It kiln dried and dressed lumber, produced flooring, boxes, and lath, and continued E-G's efforts to sell prefabricated, portable, demountable buildings to the CCC.

There was substantial continuity between petitioner and E-G in terms of management, executive personnel, and concentration yard personnel. Petitioner also acquired E-G's customers, and entered the concentration yard business as an established organization.

In the 1920's, E-G had its own stand of timber from which it cut. It operated a band mill with annual capacity of 60 to 80 million board feet and also purchased logs and timber. E-G would saw the rough planks, dry the lumber in kilns, dress it into a pattern and place it in the dry shed ready for sale. It also manufactured various other products, and had in addition investment properties yielding a very small income.

Lumbering activity in the virgin pine forests of Mississippi developed into a major industry after 1900. At its peak in 1925, it employed 40,000 persons, over two-thirds of those employed in all industry in the State. Little or no attention was paid to conservation, and when virgin timber was leveled, the large mills closed or moved out of the State.

New pine forests arose on much of the cut-over pine lands, but were slow to arise and less extensive in pine growth. New pine forests, inferior in quality and volume to those cut down, appeared on abandoned fields over much of the uplands, and acquired value as a result of scarcity and new uses, providing material for small, portable sawmills and for woodpulp mills. There was between the years 1932–1936 a substantial decline in sawlog growing stock and average tree size, but a significant increase in smaller trees.

The first lumber to achieve commercial significance in Mississippi was softwood. Production rose from 1904 through 1929 at an average annual increase of almost 20 million board feet. In 1929, the depression abruptly ended the era of heavy production in Mississippi and throughout the Nation. After 1932, softwood production speedily recovered nationally, but not in Mississippi where depletion of pine had progressed too far for more than partial recovery.

Despite declining forest resources, timber product production in Mississippi remained high. This was made possible by overcutting, industrial adjustments permitting the use of less desirable timber, greater output of less exacting products, and fuller utilization of softwood timber in pulpwood. Some of the foregoing factors were forced on the industry by the changing forest.

The foregoing and other adjustments raised costs and reduced quality, but expanded usable resources. One of the most significant changes was the replacement of large by small sawmills, which were more mobile, less costly to operate, and better able to economically handle small stands. As a result, there was during the base period sufficient lumber in Mississippi to meet the existing market.

The experience of E–G paralleled that of the lumber industry in that it realized net losses in 1927, 1928, and 1929. This trend does not appear to have ended at any time prior to its liquidation in 1937. Such losses were due in part to the depletion of E–G's timber resources, and beginning in or after 1929, in part to the depression.

By the early or middle 1930's, E–G's plant was unable to compete in the manufacture and sale of lumber. The end of its timber holdings was in sight, and the future was uncertain. By 1937 it had only a half-year's run of standing timber remaining.

As a result of the foregoing, some stockholders wished to liquidate completely and enter other lines of business. Others wished to continue those portions of E–G's facilities adaptable for use as a lumber concentration yard. Petitioner was formed by this latter group.

Petitioner took over E–G's sawmill activities exclusive of the band mill operations. It did no logging, but acquired rough lumber by contracting with small mills. E–G's investment assets were transferred to another corporation then formed for that purpose.

By 1938, petitioner had contracts with between 40 and 60 small sawmills, and was receiving a substantial volume of green lumber which it would then sort and dry and convert to finished lumber.

E–G's first experience with prefabricated, demountable buildings was in the First World War. Thereafter, attempts to sell such buildings failed until the mid-1930's. As a result, in part of efforts by representatives of E–G, the CCC decided to use such structures and in 1935 E–G sold prefabricated, portable, demountable buildings for CCC camps in the amount of $967,588.43.

E–G hired a special crew when it was awarded the CCC contracts. Upon completion of the contracts, however, no more such orders were on hand and the crew was discharged.

As a result of the CCC business, E–G thereafter had on hand and retained various facilities whereby additional such prefabricated structures could be produced. These facilities were among the assets received by petitioner as a result of the liquidation of E–G.

CCC work projects were limited to 1 or 2 years, making desirable a portable structure suited for temporary occupancy. Such structures facilitated interchanges, replacements, and relocations of campsites.

No significant demand for CCC structures existed in 1936, 1937, or the first part of 1938, but by the end of 1938 new locations were needed and many of the original camps built in 1933, 1934, and 1935 could not be moved.

Some of the equipment manufactured and used by E–G on the 1935 CCC business and taken over by petitioner was still available for use. By 1939 there were certain refinements and revisions in CCC specifications, but they were relatively minor, and prefabricated CCC materials supplied by petitioner in 1939 were basically identical to those produced by E–G in 1935. All were portable and demountable as well as prefabricated. In 1939 petitioner had a prefabrication department consisting of buildings covering several acres of ground.

The equipment for producing prefabricated CCC structures consisted essentially of jigs and radial saws. A jig is a flat table with an outline in steel beams of a panel appropriate for a particular prefabricated item. Its purpose is to enable common labor under supervision of a foreman to manufacture needed panels without making measurements.

A jig used on a particular project, if of a standard size, would continue to be used on other jobs. If a jig proved unsuitable for the next order it would be stored, and later used again whenever suitable. Few jigs were dismantled, as it was cheaper and simpler to store them.

The original expiration date of the CCC was June 30, 1940. In

1939, Congress extended its date of expiration to July 1, 1943. Industry regarded the CCC as a temporary, interim market.

In 1939 petitioner produced and sold, but did not erect, prefabricated, portable, demountable structures for CCC camps in the amount of $1,045,191.82. It sold all parts of the building shell, supplied in almost all cases electrical materials, and on some contracts furnished heating and plumbing fixtures as well.

During the 1938–1939 period, petitioner's officers discussed the general potential in prefabrication. They had in mind low-cost structures, such as section houses and tool houses for railroads, barns and storage bins on farms, and cabins in fishing camps. No such items were actually produced or sold, although petitioner had facilities for such production.

Efforts were made to extend the use of prefabricated buildings, not necessarily demountable, and almost every Government procurement office was contacted. In 1939 petitioner unsuccessfully joined in the competitive bidding in connection with a South Pole expedition.

In 1939 petitioner produced and sold two prototype or experimental prefabricated private residential units, using the basic CCC type panels with various modifications, including central heating and plumbing. These units were sold to petitioner's loading foreman and to its superintendent of fabrication. They were salable only in a "seller's" market but not under normal competitive conditions.

Petitioner initially found Government contracts for prefabricated housing to be sporadic. Thereafter, with the advent of Lend-Lease and World War II, demand overwhelmed supply, and the chief problem was production. After 1942 sales again became sporadic. Prefabricated housing had not yet received public acceptance and much promotional work was needed before it would.

During the Second World War the Government again became interested in prefabricated housing, to serve the needs of defense plant personnel. The factory techniques and fabricating were basically the same as for the CCC structures, except that better material was used and closer tolerances required. There was also greater complexity in design, because as a general rule defense houses had central heating and plumbing. This had also been true of the experimental residential dwellings previously built by petitioner, but not of CCC construction.

Petitioner's excess profits net income for the years in controversy was as follows:

| Year | Invested capital method | Income method |
|------|------|------|
| 1940 | $95,929.85 | $91,024.01 |
| 1941 | 480,796.59 | 466,193.41 |
| 1942 | 676,500.35 | 662,833.47 |

Note: The foregoing amounts reflect deductions for net operating loss carrybacks from 1943 to 1941 and from 1944 to 1942 in the respective amounts of $128,727.69 and $336,231.12.

The excess profits credit based on invested capital, as determined by respondent, and the unused excess profits credit adjustment based on invested capital for each year in controversy, are as follows:

| | Excess profits credit | Unused excess profits adjustment | From |
|---|---|---|---|
| 1940 | $42, 439. 75 | ---------- | |
| 1941 | 60, 465. 02 | $68, 959. 29 | 1943 |
| 1942 | 67, 936. 57 | 69, 231. 62 | 1944 |

Petitioner filed timely claims for relief in respect of the calendar years 1940, 1941, and 1942 and now claims a constructive average base period net income of $114,625.46. All of the excess profits taxes determined by respondent for those years have been paid.

Petitioner's corporation income tax returns (Form 1120) for each taxable period from its inception through the calendar year 1944 describe its business as follows:

| Taxable period or calendar year | Description |
|---|---|
| 10–9–37 to 12–31–37 | Refining of lumber |
| 1938 | Remanufacturing and sale of lumber |
| 1939 | Remanufacturing of lumber |
| 1940 | Re-manufacturing lumber |
| 1941 | Lumber and prefabricated houses |
| 1942 | Lumber, prefabricated houses, etc. |
| 1943 | Lumber and prefabrication |
| 1944 | Lumber and prefabrication |

Prefabricated housing has a long history of limited application. However, it did not develop commercial significance, and there was no recognizable residential prefabricated housing industry, until immediately after the Second World War. In the 1930's various factors militated against expansion of such housing, including opposition by organized labor, building code requirements in many areas difficult or impossible of satisfaction by prefabricated residences, and a poor opinion by the public of its quality. When prefabricated housing did attain commercial significance for the first time in the period immediately following the Second World War, it was in an abnormal housing situation, with a grossly inflated demand resulting from the war.

During World War II, the needs of defense housing gave an impetus to prefabricated housing. Defense housing, however, was built for limited and temporary occupancy, and was not commerically marketable. This was true to an even greater degree of prefabricated structures of the type used by the CCC.

Petitioner's total lumber sales in board feet for 1937, 1938, and 1939 have been stipulated; petitioner's books show these sales by months and in classifications as follows:

THE GREEN LUMBER COMPANY DATA FROM DAILY SALES RECORD MONTHLY SALES BY BOARD FEET

| | Lumber | | Oak flooring | Box factory | Demountable houses [CCC] | Lath (pieces) |
|---|---|---|---|---|---|---|
| | Wholesale | Retail | | | | |
| **1937** | | | | | | |
| October | 1,811,329 | 88,453 | 137,284 | 114,285 | ---------- | 17,000 |
| November | 2,569,561 | 166,682 | 76,784 | 109,215 | ---------- | 81,450 |
| December | 1,664,402 | 160,809 | 157,373 | 117,189 | ---------- | 101,700 |
| Totals | 6,045,292 | 415,944 | 371,441 | 340,689 | ---------- | 200,150 |
| **1938** | | | | | | |
| January | 2,659,904 | 208,994 | 79,508 | 94,692 | ---------- | 413,800 |
| February | 1,822,846 | 187,616 | 90,716 | 92,258 | ---------- | 108,000 |
| March | 1,933,919 | 176,470 | 140,276 | 121,652 | ---------- | 108,950 |
| April | 1,212,217 | 108,709 | 65,749 | 81,877 | ---------- | 47,250 |
| May | 1,826,181 | 74,153 | 98,484 | 61,520 | ---------- | 79,650 |
| June | 1,667,844 | 74,658 | 33,248 | 1,280 | ---------- | 17,500 |
| July | 62,593 | 132,007 | 18,705 | 2,546 | ---------- | 1,400 |
| August | 368,521 | 162,447 | 23,068 | ---------- | ---------- | 73,800 |
| September | 998,754 | 184,435 | 21,567 | 23,653 | ---------- | 76,400 |
| October | 2,513,759 | 180,194 | 34,577 | 18,727 | ---------- | 76,850 |
| November | 2,306,772 | 302,546 | 41,255 | 83,874 | ---------- | 333,200 |
| December | 2,034,665 | 235,875 | 104,572 | 68,263 | ---------- | 53,600 |
| Totals | 19,407,925 | 2,028,014 | 751,725 | 650,342 | ---------- | 1,390,400 |
| **1939** | | | | | | |
| January | 2,385,688 | 223,386 | 108,304 | 42,787 | ---------- | 46,800 |
| February | 1,844,222 | 211,905 | 59,195 | 74,114 | ---------- | 67,350 |
| March | 1,909,932 | 209,231 | 99,499 | 119,512 | ---------- | 47,400 |
| April | 1,138,846 | 166,287 | 50,456 | 93,879 | 800,000 | 78,400 |
| May | 679,015 | 151,602 | 38,363 | 4,852 | ,463,040 | 19,550 |
| June | 230,758 | 180,284 | 60,059 | 840 | 7,000,000 | 48,200 |
| July | 665,340 | 219,948 | 44,133 | 76,718 | 1,500,000 | 52,400 |
| August | 525,961 | 284,897 | 26,060 | 319 | 2,800,000 | 5,200 |
| September | 689,304 | 218,313 | 64,410 | 130,041 | 3,195,000 | 45,500 |
| October | 1,091,117 | 303,106 | 97,233 | 158,636 | 1,667,411 | 41,900 |
| November | 2,150,514 | 303,180 | 92,854 | 62,317 | 1,064,498 | 31,350 |
| December | 2,725,060 | 276,785 | 74,223 | 117,084 | 292,803 | 27,700 |
| Totals | 16,035,757 | 2,748,924 | 814,789 | 881,099 | 21,782,752 | 511,750 |

1937 totals annualized are as follows:

| Lumber | | Oak flooring | Box factory | Demountable houses [CCC] | Lath (pieces) |
|---|---|---|---|---|---|
| Wholesale | Retail | | | | |
| 24,181,168 | 1,663,776 | 1,485,764 | 1,362,756 | ---------- | 800,600 |

Petitioner's total dollar sales from the time it first engaged in business to 1939, inclusive, classified by type of product, were as follows:

| | Oct. 9, 1937– Dec. 31, 1937 | 1937 annualized | 1938 | 1939 |
|---|---|---|---|---|
| Lumber | $126,746.91 | $506,987.64 | $418,561.38 | $388,412.09 |
| Oak flooring | 17,851.20 | 71,404.80 | 34,658.96 | 39,407.77 |
| Boxes | 7,526.47 | 30,105.88 | 17,351.44 | 25,425.49 |
| Portable, demountable buildings for CCC camps | (1) | (1) | (1) | 1,045,191.82 |
| Miscellaneous | (1) | (1) | (1) | 2,781.36 |
| Total | 152,124.58 | 608,498.32 | 470,571.78 | 1,501,218.53 |

1 None.

Petitioner's taxable net income for the same period was as follows:

(Annualized,

Oct. 9, 1937, to Dec. 31, 1937, a loss of _____ $10,435.38   $41,741.52)

The calendar year 1938 a loss of _____ 43,866.58

The calendar year 1939 a profit of _____ 102,248.79

## OPINION.

Petitioner now claims relief under sections 722(b) (2), (3) (A), (4), and 722(c) of the Internal Revenue Code of 1939 [1] and contends for a constructive average base period net income of $114,625.46. As stated by it on brief:

The petitioner maintains that it is entitled to relief within the purview of Section 722, subparagraphs (b)(2), (3) and (4), and (c), on the grounds that:

(1) The petitioner was organized and began business in the last half of the year 1937, and the average base period net income does not reflect the normal operation of the business for the entire base period of the business; and

(2) The business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business two years before it did so; and

(3) The invested capital of the petitioner is abnormally low; and

(4) The taxpayer's business was depressed in the base period because residential (non-farm) construction was depressed; and

(5) The profits cycle of the residential (non-farm) construction industry differs in length and amplitude from the general business cycle; and

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle, or

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. \* \* \*

\* \* \* \* \* \* \*

(c) INVESTED CAPITAL CORPORATIONS, ETC.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer, not entitled to use the excess profits credit based on income pursuant to section 713, if the excess profits credit based on invested capital is an inadequate standard for determining excess profits, because—

\* \* \* \* \* \* \*

(3) the invested capital of the taxpayer is abnormally low. \* \* \*

(6) The interruption in the CCC Camp prefabricated, portable, demountable housing business experienced by the taxpayer due to the failure of its predecessor to continue such business after 1935, delayed the taxpayer's realization of such business until the last base period year.

## Section 722(b)(4).

Petitioner's first two grounds as stated above obviously relate to section 722(b)(4) and advance the theory that because petitioner commenced business during the base period its business had not reached its potential by the end of the base period and base period earnings did not reflect normal operations of its business.

The meaning of petitioner's sixth ground as stated above is not entirely clear, but we consider it to be a further claim under section 722(b)(4) and an allegation of a change in the character of petitioner's business. Petitioner's theory seems to be that its predecessor, E–G, had abandoned this profitable phase of its business after 1935 and that petitioner, because of its infancy, was not able to resume this profitable activity until 1939, the last base period year.

Petitioner's claim under section 722(b)(4) is therefore that it commenced business during the base period and later, but still in the base period, changed the character of its business.

It is now axiomatic that the existence of qualifying factors standing alone does not give rise to relief. Some causal connection to a constructive increased level of earnings must be shown to exist. See *Union Parts Mfg. Co.*, 24 T.C. 775, 784, and cases there cited.

Petitioner admittedly was organized and commenced business in 1937 and during the base period. The evidence is that it was organized to and did take over certain phases of a long-established and going enterprise. Nevertheless, we assume *arguendo* that it commenced business within the meaning of the statute but still the record fails to show any pattern of growth which would justify use of the push-back rule.

Regarding petitioner's sales, since its inception, of all of its products except demountable houses or buildings for CCC camps, the record shows an actual decline. Monthly averages in board feet were as follows:

|      | Board feet (round numbers) |
| ---- | ----------- |
| 1937 | 2, 458, 000 |
| 1938 | 2, 020, 000 |
| 1939 | 1, 750, 000 |

When petitioner's sales of demountable buildings for CCC camps are included in its 1939 business, the picture is entirely changed. Board feet sold is increased by nearly 22,000,000. Dollar sales are increased by over $1,000,000 and operating results progressed from a loss of almost $44,000 in 1938 to a profit of over $102,000 in 1939. But in

our view, and as is indicated in our findings, the CCC sales are not related to petitioner's commencement of business or to any change in character.

Petitioner stipulated that from the date of its organization in 1937, it continued E–G's efforts to sell prefabricated, portable, demountable buildings for CCC camps and its proof has failed to show that such efforts had ever ceased on the part of E–G or that the failure of petitioner's efforts in 1937 and 1938 was traceable to anything but the saturation and consequent nonexistence of this sporadic market.

Essentially, the situation between 1935 and 1939 was controlled not by the wishes or activities of E–G or petitioner, but by the needs of the CCC. When it needed the product, E–G and later petitioner made sales to it; when it had no needs they did not and could not make such sales. Thus the 1939 sales cannot be attributed either to petitioner's increasing maturity or to change in character of its business. They resulted instead from the reentry of the Government into a market where petitioner was, and always had been, equipped and prepared. Petitioner had the benefit of these 1939 sales in its base period and has shown us no reason why the push-back rule should be used for its benefit.

We find the present situation closely parallel to those found in *Michael Schiavone & Sons, Inc.*, 27 T.C. 497, and in *Morgan Construction Co.*, 23 T.C. 242. In *Schiavone* we found that increases in the volume of taxpayer's business were related to increases in the prevailing market prices for scrap metal rather than to taxpayer's efforts and increasing maturity. In *Morgan Construction Co.*, we found that the invention, development, and sale of Morgoil bearings constituted a change in the character of the taxpayer's business but held that the evidence had failed to establish what additional sales, if any, the taxpayer would have had in 1939, stating at page 253:

Petitioner could only sell the bearings when and as the rolling mill industry was ready to purchase them. * * * There is no convincing evidence that the industry would have been ready to absorb any appreciably greater number of the larger bearings during the base period even if the defects had been earlier corrected.

Although not stated as one of its grounds for relief, petitioner at times seems to argue that during the base period it commenced a new line of business, that of residential construction. The record does not support this contention.

Petitioner's actions during the base period show only that it was considering such activity, but it did not then enter that field or commit itself to do so. Only two units, both experimental or prototype, were manufactured in the base period, and both were sold to employees, nor was any greater activity taken in this regard in 1940; in fact, prefabricated houses were mentioned on petitioner's tax return for the first time in 1941. As we said in *Avey Drilling Ma-*

*chine Co.*, 16 T.C. 1281, 1298, "A change in character, within the intent of the statute, must be a substantial departure from the preexisting nature of the business." Petitioner has shown no such change.

Because of the foregoing, we conclude that petitioner has not established any right to relief under section 722(b)(4).

## Inadequacy of Invested Capital.

Petitioner's third ground can relate only to section 722(c)(3). This ground for relief was not asserted in the applications filed by petitioner. Inadequacy of invested capital was not alleged in the petition, nor was the matter raised at the trial herein. It is too clear to require extended discussion that this ground is no longer open to petitioner. Cf. *Burwell Motor Co.*, 29 T.C. 224.[2]

## Nonfarm Residential Construction.

Petitioner's fourth and fifth grounds seek relief under section 722(b)(2) and (3)(A), respectively. Both points rely, however, upon asserted conditions in the nonfarm residential construction industry. At the very outset their validity requires proof that petitioner was a member of that industry, and such proof is entirely lacking.

Petitioner's only activity during the base period relating to such construction consisted of the production in 1939 of two experimental or prototype units, which it sold to employees. This is hardly sufficient to place petitioner in the industry in question.

Testimony by one of petitioner's officers that 60 per cent of its sales went into domestic construction is not enlightening. That term embraces much in addition to nonfarm residential construction, and no breakdown was furnished. Indeed, the record affirmatively shows that in 1939 more than two-thirds of petitioner's sales (in dollars) consisted of housing material sold to the CCC, an activity clearly outside the field of residential housing.

Finally, the record fails to show that during the base period petitioner was engaged in any kind of construction. It fabricated panels and other parts of prefabricated structures, but did not erect them. Its field of endeavor would more properly seem to be that of the supply or manufacture of structural materials, and the record fails to show the proportion of its sales for "residential" purposes as that term is commonly understood.

In view of petitioner's failure to prove that it was a member of the nonfarm residential construction industry, or of any other industry depressed during the base period by reason of temporary

---

[2] Our conclusion that the issue is not properly before the Court obviates the necessity of deciding whether petitioner is, in any event, eligible to assert section 722(c) as "a taxpayer, not entitled to use the excess profits credit based on income."

economic events unusual to that industry, or that petitioner's business was depressed because of a variant profits cycle in such industry, petitioner has failed to qualify for relief under either (2) or (3) (A) of section 722 (b).

In view of the foregoing, we have no choice but to sustain respondent's determination.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*