ORANGE ROLLER BEARING CO., INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32108.    Filed March 31, 1960.

*Harold D. Cohen, Esq.*, for the petitioner.
*John K. Barry, Esq.*, for the respondent.

### OPINION.

ARUNDELL, *Judge:* The respondent denied petitioner's applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939,[1] and related refund claims for the taxable years ended October 31, 1941, through October 31, 1946.

Petitioner seeks relief under section 722(b)(4) upon the ground that it changed the character of its business during and immediately prior to the base period and its average base period net income does not reflect the normal operation of its business for the entire base period. Petitioner alleges that an increased level of earnings resulted from the changed character of its business and that its level of earnings would have been higher than it actually was at the end of the base period if such change had occurred 2 years earlier than it did. Petitioner asks the Court to hold that a fair and just amount representing normal earnings for its base period is $105,000.

Petitioner contends that it changed the character of its business in three of the categories enumerated in section 722(b)(4) in that it had:

(1) A change in the operation or management of its business;

(2) A difference in the products or services furnished; and

(3) A difference in the capacity for production or operation.

Petitioner further contends that if these changes had been made 2 years earlier, its average base period net income would have been $105,000 instead of the actual amount of $193.29. In arriving at this reconstructed amount of $105,000, petitioner has reconstructed its needle bearing sales for the calendar year 1939 [2] from an actual amount of $57,564.29 to an amount ranging between $303,870 and $361,696.

---

[1] All Code and sectional references herein relate to the Internal Revenue Code of 1939, as amended.

[2] In making this reconstruction, petitioner has recognized the mandate of section 722(a) which provides, in determining the constructive average base period net income, "no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939."

The evidence in this case was presented before a commissioner of this Court. The commissioner made a report of his findings of fact, which report was served upon the parties on June 17, 1959. In commenting upon this report in its reply brief, petitioner states, "Petitioner believes that the Commission's findings are well supported by the evidence and constitute a fair statement of the basic facts regarding the qualifying factors in the case." However, both parties have requested certain additional findings with respect to the ultimate facts and reconstruction. These additional findings requested by the parties, including ultimate conclusions, will be hereinafter set forth to the extent granted.

The Court adopts the commissioner's report as its findings of fact with minor exceptions hereinafter noted. For the purposes of this opinion, the pertinent facts will be summarized and the ultimate facts and conclusions appropriate for the disposition of this case will be found.

Petitioner was incorporated in 1922 under the laws of New York as Sholes, Incorporated, with an authorized capital of $50,000. Prior to 1932 it manufactured and sold sheet metal products and operated a machine shop in New York City. Early in 1932 it purchased the business and certain assets, including real estate and a factory building situated in Orange, New Jersey, from a roller bearing company then on the verge of bankruptcy. After the purchase, petitioner moved its operations from New York to its newly acquired plant in New Jersey.

In making the purchase, the management of petitioner was convinced that the operation of a roller bearing department or division as a part of its business would be beneficial. In addition to paying $15,000 cash, management agreed to pay one-half of the net profits of the bearing business only, for not exceeding 50 months, but not more than an additional $25,000.

The first entry reflecting sales by the so-called "bearings division" appeared in petitioner's sales journal for April 1932. By April 1933, the monthly sales of this division were consistently more than half of petitioner's monthly sales and remained so until February 1934.

In February 1934, Whitehead Metal Products Company took over the stock and operational control of petitioner. This occurred when petitioner failed to meet the payments on its inventories which had been pledged to Whitehead who was petitioner's principal supplier of raw metal. At or about this time, Fred G. Keyser, representing Whitehead, became a director, vice president, and later general manager of petitioner.

At the time of the previously mentioned purchase in 1932, petitioner retained 12 of the former employees of the roller bearing

company. One of those retained was Charles L. Ritchie, an estimator for special jobs. Ritchie had been employed continuously by the roller bearing company from 1919 to 1932 in various official capacities.

Petitioner hired Ritchie as the estimator for its so-called "bearings division." The products manufactured by this division included roller bearings of various types and for various applications, screw machine products, and parts of bearings ordered by other manufacturers. In estimating special jobs for the machine shop, Ritchie used blueprints provided generally by the customer. Ritchie's job did not include estimating machine shop work on petitioner's metalsmith products.

Shortly prior to October 31, 1936, James A. Burden and his mother, F. Adele Tobin, purchased a majority of petitioner's capital stock. At the time of their purchase, neither Burden nor his mother had had any experience in managing or operating a bearing concern. During 1936 Burden became president, Ritchie became a vice president, and Keyser continued in office as a vice president. On October 27, 1936, petitioner changed its name from Sholes, Incorporated, to Orange Roller Bearing Co., Inc.

During the period July to October 1936, Ritchie became convinced that there was a demand for a good needle bearing.

Prior to December 1936, petitioner's engineers and Ritchie began experimenting a little in the development of bearings. When the various market surveys indicated that there was a demand for an efficient needle roller bearing, petitioner directed its experiments toward the development of a needle roller bearing that would eliminate objectionable features of needle roller bearings then on the market.

In December 1936 petitioner employed a graduate engineer, Harold G. Young, as a sales manager for its bearings. Thereafter, Ritchie and Young made field trips to survey the potential market for a standard line of needle bearings. They discussed the use of needle bearings with the engineers of various manufacturers in major industrial areas and informed them that petitioner was going to produce a line of needle bearings.

Ritchie and Young discussed with Burden the problem of financing a complete line of needle bearings.

Between July and October 1937 petitioner prepared detailed drawings for a complete line of needle roller bearings for various shaft sizes. As soon as these drawings were completed, petitioner purchased the raw material and started production of a complete line of needle roller bearings. Late in 1937 or early in 1938, petitioner prepared and published its first catalog on needle roller bearings.

During 1937 and the remainder of the base period, Young was engaged in selling, developing, and servicing petitioner's roller bearing business and particularly its needle roller bearings.

Prior to 1939 petitioner had manufactured staggered roller bearings on special order but had maintained no stock thereof. In or about 1939, Ritchie and Young ascertained that there was a sufficient demand to justify petitioner in producing a complete line of staggered roller bearings. During 1939, petitioner's engineering department developed a complete line of drawings for staggered roller bearings. In the latter part of 1939 this line was completed and put into production. In the early part of 1940 petitioner issued a catalog showing a standard line of staggered roller bearings which it carried in stock. Petitioner sold its line of staggered roller bearings through its sales representatives and through advertising. The first advertising of petitioner's standard line of staggered roller bearings occurred late in 1940 and was handled by an advertising agency.

Early in 1940, petitioner developed a "cage-type" needle roller bearing for unusual conditions in industry. The cage-type needle roller bearing was designed to keep the needle rollers permanently aligned and true-running regardless of whether the application was vertical, tilted, or horizontal.

In addition to manufacturing needle and staggered roller bearings, as aforementioned, petitioner manufactured and sold some tapered roller bearings for the replacement market. Petitioner had entered the replacement market in 1933 or 1934 and in 1934 had begun to stock some standard sizes of tapered roller bearings for sale as replacement parts in cars, buses, and trucks.

During its base period, petitioner also continued to make straight bearings on a special order basis, to manufacture hardened and ground parts on its screw machines, and to operate the metalsmith business originally conducted by petitioner.

During the base period years, petitioner increased its capacity for production and operation by purchasing additional fixed assets in the total amount of approximately $95,000 which included additional machinery and equipment, shop tools, patterns, dies, and molds for its bearings division in the total amount of approximately $82,255. Burden and his mother provided most of the funds used to purchase the additional fixed assets.

During the calendar year 1939 petitioner sold needle bearings to manufacturers of many different types of machinery including: (1) Extractive machinery, such as coal-mining and oil-producing machinery; (2) fabricating machinery, such as breadmaking machines, steel-mill equipment, papermill equipment, and printing press

equipment; (3) prime movers; (4) conveyors; (5) transportation equipment; and (6) machine tools. Petitioner made most of these sales directly to the manufacturers and through its distributors.

During the fiscal years 1936 to 1940, inclusive, petitioner's bearing sales constituted an increasing proportion of its total annual sales, the approximate percentages being 36, 45, 59, 65, and 61 per cent, respectively. During the same years, petitioner realized gross profits from its sales of bearings, metalsmith products, hardened and ground parts, and all products combined, percentagewise, as follows:

| Product | Fiscal years | | | | |
|---|---|---|---|---|---|
| | 1936 | 1937 | 1938 | 1939 | 1940 |
| | Per cent | | | | |
| Bearings | 21 | 22 | 19 | 20 | 33 |
| Metalsmith | 23 | 29 | 16 | 21 | 25 |
| Hardened and ground parts | 23 | 24 | 27 | 33 | 36 |
| All products combined | 22 | 25 | 20 | 22 | 32 |

During fiscal 1938, 1939, and 1940, petitioner realized 34, 29, and 38 per cent of gross profits on its annual sales of needle bearings.

For each of the taxable years 1941 to 1946, inclusive, petitioner computed its excess profits credit under section 714 since the invested capital method resulted in a lesser tax than the income method provided under section 713. During such taxable years, petitioner's excess profits credits ranged from a low of $30,144.81 for fiscal 1942 to a high for fiscal 1946 of $52,546.94.

We may assume without deciding that petitioner has established one or more of the so-called qualifying factors in that during or immediately prior to the base period it changed the operation or management of its business; that it introduced such new products as needle and staggered roller bearings; and that it increased its capacity for production and operation. But, as we said in *Green Lumber Co.*, 32 T.C. 1050, 1058, "It is now axiomatic that the existence of qualifying factors standing alone does not give rise to relief. Some causal connection to a constructive increased level of earnings must be shown to exist." This increased level of earnings must be of sufficient magnitude to produce an excess profits credit under the income method, which will produce a lesser tax than is produced with the excess profits credit petitioner already has under section 714. *Lamport Co.*, 17 T.C. 1079; *Green Spring Dairy, Inc.*, 18 T.C. 217; *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T.C. 241; *N. Hess' Sons, Inc.*, 31 T.C. 385.

Petitioner's total annual sales, cost of goods sold, and gross profit (cents omitted) for each classification of products sold for the fiscal

years 1936 through 1940 were as follows (Note: For 1936 and 1937, needle roller bearing sales are included in the industrial bearings category, as are staggered roller bearing sales for fiscal years 1936 to 1940, inclusive. Estimated needle roller bearing sales for fiscal 1936 and 1937 were $1,433 and $15,869, respectively):

|  | 1936 | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|---|
| **Sales:** |  |  |  |  |  |
| Industrial bearings | $54,767 | $110,533 | $101,307 | $90,376 | $126,368 |
| Replacement bearings | 18,755 | 23,605 | 18,696 | 28,089 | 19,155 |
| Needle bearings |  |  | 25,707 | 44,502 | 89,860 |
| Hardened and ground parts | 60,545 | 75,207 | 52,057 | 41,763 | 95,965 |
| Metalsmith | 69,808 | 85,949 | 49,851 | 44,586 | 56,936 |
| Total sales | 203,877 | 295,295 | 247,621 | 249,318 | 388,287 |
| **Cost of goods sold:** |  |  |  |  |  |
| Industrial bearings | 44,728 | 88,673 | 83,454 | 69,260 | 76,683 |
| Replacement bearings | 13,562 | 16,224 | 17,667 | 28,856 | 25,872 |
| Needle bearings |  |  | 16,906 | 32,503 | 55,756 |
| Hardened and ground parts | 46,622 | 57,033 | 38,084 | 27,837 | 61,178 |
| Metalsmith | 53,932 | 60,685 | 41,744 | 35,192 | 42,964 |
| Total | 158,846 | 222,617 | 197,856 | 193,650 | 262,455 |
| **Gross profit on sales:** |  |  |  |  |  |
| Industrial bearings | 10,039 | 21,859 | 17,853 | 21,115 | 49,685 |
| Replacement bearings | 5,192 | 7,381 | 1,029 | (766) | (6,717) |
| Needle bearings |  |  | 8,801 | 11,998 | 34,104 |
| Hardened and ground parts | 13,923 | 18,173 | 13,972 | 13,925 | 34,787 |
| Metalsmith | 15,875 | 25,263 | 8,107 | 9,394 | 13,972 |
| Total | 45,031 | 72,678 | 49,764 | 55,668 | 125,831 |

Petitioner's selling expense, selling profit, general expense, operating profit or loss, other income, other deductions, and net excess profits income (or loss) per tax return for the fiscal years 1936 through 1940 were as follows (cents omitted):

|  | 1936 | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|---|
| Selling expense | $18,195 | $30,435 | $25,635 | $29,165 | $39,658 |
| Selling profit | 26,836 | 42,243 | 24,128 | 26,502 | 86,173 |
| General expense | 15,921 | 22,683 | 23,006 | 26,246 | 28,697 |
| Operating profit (or loss) | 10,914 | 19,559 | [1] 1,122 | 256 | 57,475 |
| Other income | 910 | 993 | 2,145 | 1,949 | 2,766 |
| Other deductions | 5,696 | 20,618 | 11,530 | 8,023 | 10,902 |
| Net excess profits income (or loss) | 6,127 | (64) | (42,684) | (5,817) | 49,339 |

[1] Before loss on revaluation of inventory of $34,422.

The actual average excess profits net income for the base period (fiscal years 1937 through 1940) as shown in the preceding schedule is $193.29.

Petitioner, in contending for a reconstructed excess profits net income for the base period, has laid its emphasis on what the sales of its needle bearings for the calendar year 1939 would have been if it had made that change in character 2 years earlier and has contended that the other qualifying factors be given some plus value. Petitioner offered the testimony of Ritchie, Young, and an economist to the effect that with 2 years of additional experience with the needle

bearings, its sales for the calendar year 1939 of needle bearings would have been approximately $361,000. This would have been at an average of approximately $30,000 a month. Petitioner's actual 1939 sales of needle bearings averaged less than $5,000 per month, the parties having stipulated these monthly sales of needle bearings for the calendar year 1939 to be (cents omitted) $3,050, $2,607, $2,752, $3,701, $4,571, $4,340, $4,964, $4,195, $5,998, $3,497, $8,148, and $9,736, respectively. From these stipulated facts we note that over 47 per cent of petitioner's calendar year 1939 needle bearing sales was made during the last 4 months of 1939, which were the first 4 months of World War II. Respondent offered the testimony of an economist who testified that with 2 years of additional experience in manufacturing and selling needle bearings petitioner's sales thereof for the calendar year 1939 might have reached $110,000. After a thorough and careful consideration of all the evidence, we are of the opinion that the maximum sales of needle bearings petitioner could have made during the calendar year 1939 under the base period economy and conditions under which petitioner was operating would not have exceeded $120,000.

Another facet of petitioner's reconstruction merits comment. Petitioner used 45.62 per cent of net needle bearing sales as representative of the constructive cost of goods sold. Our findings show that historically petitioner never approached such a degree of efficiency. During the fiscal years 1936 through 1940, petitioner's cost of goods sold for all products (including needle bearings) constituted approximately 78, 75, 80, 78, and 68 per cent, respectively, of net sales; similarly, for the fiscal years 1938, 1939, and 1940 petitioner's cost of goods sold for needle bearings constituted approximately 66, 71, and 62 per cent, respectively, of petitioner's needle bearing sales. The stipulated facts show net sales and cost of goods sold for the fiscal years 1932 to 1946, inclusive. In no year of this 15-year period was petitioner's cost of goods sold less than 60 per cent of net sales, and in its base period years petitioner's cost of goods sold averaged approximately 75 per cent of net sales.

We note, too, that in computing gross profit petitioner's reconstruction used 1939 actual net sales of all products other than needle bearings, namely, $213,805, and 1939 actual cost of goods sold for all products except needle bearings, namely, $169,361. These actual figures show that petitioner's cost of goods sold constituted 79 per cent of its net sales of all products other than needle bearings. While we recognize that petitioner has reconstructed only the needle bearing portion of its business, the disparity between the

percentages used in its reconstruction (45.62 per cent for needle bearings and 79 per cent for all other products) emphasizes, in our opinion, the unrealistic nature of petitioner's reconstruction.

As heretofore mentioned, petitioner's excess profits credits under section 714 ranged from a low of $30,144.81 to a high of $52,546.94. In order for petitioner to secure any relief under section 722, it would have to establish a minimum CABPNI of an amount in the neighborhood of about $30,000. Based upon reconstructed needle bearing sales for the calendar year 1939 of approximately $120,000, and a more realistic approach to the cost of producing needle bearings, and the recognition of the plus factors claimed by petitioner, it is impossible to arrive at any CABPNI anywhere near the $30,000 above mentioned. It follows and we so hold and find that petitioner is not entitled to any relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*