*Decision will be entered under Rule 50.*

CONTINENTAL FOLDING PAPER BOX COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24929. Promulgated December 13, 1951.

*Benjamin Mahler, Esq.*, for the petitioner.
*Charles R. Johnston, Esq.*, for the respondent.

988

[redacted]

OPINION.

DISNEY, *Judge:* Petitioner's claim for relief is under the provisions of section 722 (b) (4) of the Code, which relates to changes in the character of a taxpayer's business. The provision defines a "change

in the character of the business" as including "a difference in the capacity for production or operation." It also provides that a change in capacity for production or operation consummated after December 31, 1939, "as a result of a course of action to which the taxpayer was committed prior to January 1, 1940 * * * shall be deemed to be a change on December 31, 1939, in the character of the business."

Petitioner relies upon the acquisition of the 6/0 Miehle press and Berry Lift to establish a change in character of business and alleges that it committed itself to purchase the machines in 1939. Respondent contends that no steps were taken to purchase the machines until 1940. Did petitioner show that it committed itself to purchase the machines in 1939, as alleged by it? Determination of the question entails examination of extended testimony and of two letters introduced.

In support of its contention, petitioner relies upon testimony of two of its officers, Robert Rossum and Abraham Rossum, and Henry Davis, who in 1939 and 1940 was general manager and treasurer of the Weinstein Co., from whom the machines were purchased.

Robert Rossum testified that during the years 1936 and 1937 there was some discussion about the purchase of additional equipment and inquiries were made of the Miehle Co. and various machine dealers from time to time concerning the availability of a press, but no definite action was taken, and that oral inquiries were also made by Abraham Rossum or Charles Rossum in late 1938 and early 1939. He also testified that a decision was made in 1939 to purchase the press in order to take care of additional business offered by Rockwood and Company, a customer which purchased all of its requirement of boxes from petitioner.

Abraham Rossum, petitioner's president and officer in charge of production, testified that the latter part of July or sometime in August 1939 he requested Davis to look for a used 6/0 Miehle press, that not later than a couple of weeks thereafter Davis informed him that he had located such a press, whereupon he "Told him to go ahead—it is our press, go ahead, recondition it for our purpose," that at that time he requested Davis to order a new Berry Lift to use with the press, without inquiring how long it would take to get the lift, that he ordered a new lift and Davis so understood him, and that the lift was received directly from the Berry Machine Co. without going through Weinstein Co.

Davis testified at considerable length concerning the transaction. His recollection of the matter was based upon memory refreshed in 1946 when records of Weinstein Co. were examined in connection with the writing of the letter of January 31, 1946, to petitioner. He testified that there might have been some discussion about the purchase

three or four months prior to August 1939, that petitioner "more or less" gave him an oral order for the press in August 1939, that "I believe we went out and tried to locate one of the machines," that he did not exactly recall when they located it, but that it must have been in 1939. He also testified that he did not know when the press was received in the plant of Weinstein Co. for reconditioning or the parts it needed and its condition when received, but that before starting reconditioning work he notified petitioner of the receipt of the press and inasmuch as the invoice for the press was rendered May 23, 1940, and it takes from six months to as long as a year to recondition a press, deliver it and get it running, the time of his notification must have been in 1939. Other testimony of Davis is that it took from two to four months to obtain parts from the Miehle Co., and that he did not know how long it took to recondition the press involved here.

Petitioner did not confirm the oral order in writing or receive any correspondence from Weinstein Co. with respect to the order. It was not unusual for Davis to accept orders given orally.

Davis had to rely upon reference by petitioner's counsel to a bill of lading showing shipment of the lift by Berry Machine Company on February 10, 1940, to establish the sale of a Berry Lift to petitioner. Based upon an assertion that "with Berry it used to take three, four, or five months to get a lift from them," he "thought" the order was placed with Berry three or four months before February 10, 1940. Thereafter he testified that it took "quite a bit" of time to get a lift from the Berry Machine Company based upon experiences of a delay of 3 months on one occasion, 6 months on another, and over a year on another order, and that he was "pretty certain" that he never received one in less than 3 months. He then testified that he had a definite recollection that he was never, including in 1939, able to get a Berry Lift sooner than 3 months. Thereafter he testified that Weinstein Co. ordered a new lift from the Berry Machine Company, that Weinstein Co. never actually handled the machine, and that he had no idea of the length of time it took to ship or get the lift as he did not know conditions at that time. Other testimony of Davis is that when he was told "to go ahead," perhaps in August 1939, he knew it took about three months to get a lift and it is possible that the order was placed at that time and that the delay extended to four or five months. Nowithstanding the fact that the testimony above referred to had reference to the acquisition of a new lift directly from the Berry Machine Company, the manufacturer, in St. Louis, Missouri, Davis testified thereafter that he did not know whether the lift sold to petitioner was a new one or a reconditioned machine, and that he did not know whether the agreement for the press included the acquisition of the lift.

The testimony above referred to tends to establish that petitioner placed a binding order for the press and lift about August 1939. However, other evidence, which we must likewise consider, conflicts therewith and tends to establish that the commitment was not made until the next year. Respondent places considerable reliance upon the letter of March 23, 1943, to establish that petitioner was not committed to purchase the machines until 1940.

The letter written in 1943 was signed by Israel Shapiro on behalf of Weinstein Co. Shapiro had been the bookkeeper of Weinstein Co. since 1937 and as such not only kept the company's books, including its order and sales books, but had access to its correspondence. Davis testified that he had a bona fide commitment from petitioner to get a press, that he took it for granted that he would be able to get one and that petitioner "accepted it on that basis," that "whenever we took an order we never considered it a bona fide order until we satisfied the customer, and then we expected to get paid in full," that Weinstein Co. had no order forms and that when he told Shapiro to place an order in his (Davis') order book "it was an order." No down payment was made but at some undisclosed time one-half of the purchase price of the press was paid on account. There is no testimony in the record of the date when, if ever, Davis instructed Shapiro to enter the transaction as an order. Whether petitioner was "satisfied" at any time prior to delivery and acceptance of the machine so as to have its order regarded as such by the Weinstein Co. is not shown in the record.

The letter of March 23, 1943, from Weinstein Co. informed petitioner that the press and lift were "purchased from us in the early part of 1940" and that petitioner's inquiries "for this machinery were received by us during the summer of 1939." Without evidence in the record establishing otherwise, we are in no position to say that Shapiro did not examine the records of Weinstein Co. (including Davis' order books in which, under Davis' testimony, Shapiro placed orders and to which he had access) to obtain the information set forth in the letter. The letter implies that the data was obtained from records of Weinstein Co., which were destroyed in 1950 for years prior to 1947. The letter discloses no more than inquiries in 1939, which are far from a commitment within the meaning of section 722(b)(4), particularly in the light of testimony of Davis that he did not regard an inquiry as an order, and the reference to purchase in early 1940, which tends to negative earlier commitment.

The letter of January 31, 1946, was written pursuant to a request made by petitioner on Davis without a statement of the purpose for which it was to be used. It is not clear whether he took part in an examination of the records of the company in connection with the writing of the letter. He testified that the letter was written by

Shapiro in accordance with instructions given by him, that at that time "I had them check the records" and "* * * we looked it up," that when the letter of January 31, 1946, was written Shapiro did not tell him that he had written a letter on the subject in 1943, that he asked Shapiro to get the information and sent it to petitioner, that when told by Shapiro what the record showed "I told him to send the letter," that Shapiro had possession of all of the records and "He is the one that checked it." He then testified that he just "looked in the order book to see the date of the order when placed," and that Shapiro must have examined it with him. He testified also that the little order book kept for orders the day received would be among the books to which Shapiro had access when he wrote the letter in 1943.

The petition filed herein, verified by Abraham Rossum, alleges that Weinstein Co. located a Berry Lift on December 18, 1939, and promptly commenced to recondition it. The allegations are in accordance with assertions made in the letter written by Weinstein Co. to petitioner on January 31, 1946. The record here is devoid of any explanation as to the wide discrepancy between the allegation in the petition and the statement in the letter of January 31, 1946, on the one hand, that the lift was reconditioned by the Weinstein Co., and, on the other hand, the positive testimony before us, particularly of Abraham Rossum, that a new lift was ordered and received. The difference is made more significant by the fact that the records of Weinstein Co. were, according to testimony of Davis, examined especially to obtain the data for inclusion in the letter.

Aside from the discrepancy just referred to, the letter asserts that the sale of the press was made on December 30, 1939, contrary to the letter of March 23, 1943, in which it is stated that the petitioner purchased the press in the early part of 1940. The date of December 30, 1939, was not referred to in any of the testimony as the date of purchase of the press. That date is not near the date the order was allegedly given or the date of delivery of the press. If the date reflects what the order book and other records of Weinstein Co. showed, the same date of purchase should have been given in the earlier letter. The grossly misleading information given in the letter of January 31, 1946, concerning the reconditioning of the lift, and stating that Weinstein did it, in spite of the fact that there was no reconditioning since it was a new machine, and was never in the physical possession of Weinstein Co., is clear ground for declining to rely upon it as proof that petitioner was committed to purchase either the press or the lift in 1939.

We have carefully examined and compared all of the evidence having any bearing on the point. It contains various inconsistencies.

We are not convinced that any commitment was made in 1939. Not only was the recollection and testimony of Davis based upon refreshment in 1946 of his memory by the letter written by Shapiro at that time, but he showed himself to be uncertain of the facts, and the letter can not be reconciled with the one written in 1943, also by Shapiro, who had then access to the records, including Davis' order book, nor can it be reconciled with other evidence of record, as above seen. Though there was destruction of Weinstein's records (in July 1950, long after filing of this case on September 12, 1949), no reason appears why the records of the Miehle Co. or the Berry Co., showing dates, such as orders for parts for the reconditioning, or order for the new Berry Lift, were not produced or why the Weinstein records were not examined before destruction. Under Davis' testimony, that "We must have written the Miehle Company and ordered them," Miehle would reasonably have records on the matter. No indication appears to the contrary. Shapiro, the bookkeeper for Weinstein, did not testify, and nothing indicates that he was not available to explain the strong conflict between his two letters, the latter of which contains statements by other evidence shown to be contrary to fact. Though Davis said there was discussion earlier than August 1939, he also said that it usually took four or five months' discussion before sale of a two-color Miehle press, which indicates that much discussion before agreement or commitment, and the letter of January 31, 1946, says that the petitioner's first inquiry to Weinstein about the machine was about August 1, 1939. This reference to first inquiry, about August 1, 1939, and the statement in the letter of 1943 that the inquiries were made in 1939, together with reference to four or five months' discussion before sale, indicates that the commitment may have been after January 1, 1940. The letter of 1943 places in 1939 only the inquiries, and puts the purchase in 1940. There is discrepancy between Davis' testimony that there was commitment for him to go ahead and get a Miehle press and the letter of 1946 stating that after a first inquiry about August 1, 1939, and the locating of a Miehle press on August 10, 1939, and notification of petitioner thereof the price was fixed at $10,000. Commitment prior to fixing of price appears unrealistic. Davis testified also that an inquiry was not an order, and under his statement that Weinstein never considered an order bona fide until they satisfied the customer, it appears that Weinstein did not regard petitioner as committed earlier than May 1940 when the machine was delivered. If Weinstein would not hold petitioner to any earlier agreement, obviously petitioner was not committed. Under the evidence before us, the Miehle press could have been reconditioned within the year 1940 before delivery. The letter of January 31, 1946, though the basis of Davis' often uncertain recollection, in its detail about reconditioning a Berry

Lift, contrary to the fact that a new one was both ordered and delivered, and the reference to sale of the Miehle press on December 30, 1939, indicates undue and unfounded effort to put the transaction in 1939. We conclude from all of the evidence that petitioner has failed to show that it was committed prior to January 1, 1940, to a course of action for a change in the capacity for production or operation of its business, and we hold therefore that the petitioner is not entitled to relief under section 722, Internal Revenue Code. We having so concluded, it is unnecessary to consider other grounds ancillary to commitment, relied upon by petitioner for relief, since without the commitment they would be of no effect.

Inasmuch as the record before us contains contradictory statements as to the amounts of deficiency for 1944 and 1945,

*Decision will be entered under Rule 50.*

Reviewed by the Special Division.

---

MURDOCK, *J.*, dissenting: I would conclude from the evidence that the petitioner had ordered and was committed, prior to January 1, 1940, to receive the press and lift at a later date.