ROBINSON TERMINAL WAREHOUSE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21051, 23480. Promulgated March 31, 1953.

*Robert Ash, Esq.*, and *Carl K. Goodson, Esq.*, for the petitioner.
*William J. Stetter, Esq.*, and *Stafford R. Grady, Esq.*, for the respondent.

OPINION.

WITHEY, *Judge:* Petitioner seeks relief as provided in section 722 of the Internal Revenue Code in regard to its excess profits taxes for the fiscal years ending June 30, 1944, 1945, and 1946.

Petitioner contends it qualifies for relief under section 722 (a) and (b) (4)[1] by reason of the following facts: (1) that a change in the

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) * * * regard shall be had to the change in the character of the business under section 722 (b) (4) * * * to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and dis-

character of the business was consummated after December 31, 1939, as a result of a course of action to which it was committed prior to January 1, 1940; (2) that there was a change in the character of the business during the base period, specifically, a difference in the capacity for operation; and (3) that it commenced business in the base period.

We shall consider, in order, each of the factors relied upon by the petitioner and determine whether it is entitled to relief by reason thereof.

Robinson was first contacted by the Herald in June 1937 and requested to find facilities to store its newsprint. He submitted a written proposal to that end to the Herald but this proposition was never accepted or acted upon. In 1938 one of Robinson's employees contacted the Post and on July 13, 1939, after negotiating for several months, petitioner and the Post signed a contract. The contract provided the petitioner was to build a warehouse for the Post newsprint to be completed by November 1, 1939. A short time prior to the date of the Post contract Robinson purchased a parcel of real estate which was conveyed to petitioner upon its organization in June of 1939. The warehouse was constructed on the southeastern corner of the parcel. In November 1939, petitioner entered into an oral agreement to receive, store, and deliver newsprint to the News. The newsprint for the News and Post was stored in the warehouse constructed for the Post until May 1, 1940. On May 1, 1940, petitioner leased a warehouse from the Southern Railway to store the newsprint for the News.

The Herald had been leased to Eleanor Patterson shortly before Robinson had been asked to find facilities to store its newsprint. Petitioner continued to negotiate with the Herald relative to provid-

---

criminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

    *         *         *         *         *         *         *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business, or

    *         *         *         *         *         *         *

ing warehouse facilities after the first proposal was rejected. On September 30, 1940, Montmorency Paper Company, Ltd., which company then had the contract to supply the Times-Herald newsprint, and petitioner signed a contract whereby petitioner agreed to store and deliver newsprint to the Times-Herald for Montmorency Paper Company, Ltd. Petitioner's contention is that, originating in 1937, there began a series of negotiations with the Herald which establish a commitment requiring it to erect a warehouse in September 1940 to store newsprint for the Times-Herald and that the business obtained from the Times-Herald should be used in reconstructing a constructive average base period net income. We do not agree that these facts show a commitment. It is undoubtedly true that when any person enters business he hopes to obtain certain customers, but something more than hope, desire, and expectation is needed to demonstrate a commitment under section 722 (b) (4). A definite plan, together with action taken on the strength of such plan, must be shown as was presented by the petitioner in *Studio Theatre Inc.*, 18 T. C. 548.

The Herald had been leased to Eleanor Patterson but a short time prior to Robinson's first written proposal for warehousing its newsprint. She had no contractual obligations for the supply of newsprint and continued to receive newsprint from American Newsprint, Inc., during 1937 and part of 1938. She then negotiated with Perkins-Goodwin Company, which company supplied newsprint for the balance of 1938, 1939, and 1940. Eleanor Patterson continued to use the same warehouse and in fact renewed the lease thereon in 1939, said renewal running to June 1941. These facts indicate to us that petitioner could not have been committed prior to December 31, 1939, to any course of action with respect to the Times-Herald business.

Petitioner argues that the act of placing the first warehouse to be constructed on the southeastern corner of its water frontage is consistent with and results directly from a course of action originating in 1937 which in turn resulted in its being committed to construct the additional warehouse for the Times-Herald newsprint. We think the act is equally as consistent with a natural desire to conserve valuable water frontage. There are numerous possible explanations for so placing the building, none of which are negatived by the record. We cannot presume that because petitioner purchased water front land in an amount more than sufficient for its immediate requirements it did so because of a commitment to build an additional warehouse. Petitioner may have been compelled to buy so large a plot because it was the only available water front property economically usable and the seller may have refused to divide the parcel. To have constructed a warehouse in the middle of the lot would perhaps waste the surrounding space. By placing the warehouse in the corner petitioner might render the unoccupied land more

salable. The test to be satisfied is illustrated by the following comment in the Bulletin on Section 722, pt. V, par. (C), p. 58:

The change in position must unequivocally establish the intent to make the change within a reasonably definite period of time. Its significance should not be open to doubt. Thus, the mere purchase of land is not, standing alone, a change of position which points exclusively to the acquisition of new facilities, or pledges the taxpayer to any specific use of the land.

See also *Lockhart Creamery*, 17 T. C. 1123, 1139.

In further support of this contention that it was committed during the base period to a course of action which "unequivocally" establishes its present intent to construct the Herald warehouse "within a reasonably definite period of time" petitioner points to the length and location of the wharf constructed to facilitate the unloading of newsprint from ships. It contends a wharf of such length was not necessary for the operation of only the original warehouse and that the length thereof denotes its intention at the time of its construction to thereafter build an additional warehouse. An examination of photographic exhibits readily discloses that the wharf does not extend across the entire frontage belonging to petitioner; that the vessels used to ship the newsprint are considerably longer than the wharf; that such vessels, although it was highly desirable to do so, could not unload from all holds at once if the wharf were appreciably shorter; in short, the wharf was barely adequate for the unloading of one vessel at a time. It is evident, too, that no additional direct over-water access to the wharf was constructed when the Herald warehouse was eventually built. Such access was provided by a right-angle, over-land extension of the roadway leading from the wharf to the original warehouse. We conclude that the length and location of the wharf was as necessary for the operation of the original warehouse as for both.

Petitioner's president "thought it unwise to conclude the contract for the construction of a paper warehouse in Alexandria because of the period of transition through which the newspaper (Times-Herald) was going." We cannot reconcile his state of mind with an unequivocal commitment to a course of action leading to the post-base period construction of the Herald warehouse. On the contrary, petitioner's conclusion not to contract for construction of the Herald warehouse during the period of transition is entirely consistent with the lack of any such commitment whatsoever. Because of the foregoing facts and circumstances, we hold the petitioner has not established a commitment during the base period to a course of action consummated subsequent thereto resulting in an increased capacity to do business, and therefore is not entitled upon that ground to relief under section 722 (b) (4).

Petitioner also seeks to qualify for relief under section 722 (b) (4) by virtue of an alleged increase in its capacity for production and operation, which increase occurred during its base period subsequent to December 31, 1939.

Petitioner had constructed the Post warehouse in November 1939 with a capacity of 4,500 tons of newsprint. On May 1, 1940, it leased from the Southern Railway a warehouse having a capacity of 1,500 tons of newsprint. Petitioner contends that upon its acquisition of the leased warehouse its capacity to warehouse newsprint was increased 2,000 tons over and above the space required for the Post and News; that the additional space for 2,000 tons of newsprint was sufficient for the Times-Herald requirements and resulted in a difference in capacity for production and operation. Petitioner must, in order to qualify for relief on this ground, also establish that the additional space would with reasonable certainty produce a higher level of earnings. *National Grinding Wheel Co.*, 8 T. C. 1278; *Green Spring Dairy, Inc.*, 18 T. C. 217. Since petitioner had the business of the Post and News at the time it acquired its alleged increased capacity, it must show an ability to produce a higher level of earnings resulting therefrom from some other source. It has not done so. This record is silent with respect to the possibility of petitioner's warehousing during its base period the newsprint of any additional customer other than the Times-Herald. It is evident that the prospects of obtaining the Times-Herald business prior to the expiration of that paper's contract with Perkins-Goodwin Company was, to say the least, highly problematical. Indeed, its inability to use the increased capacity to produce a higher level of earnings from that source becomes apparent upon review of the facts. That the Times-Herald had no intention to use petitioner's facilities prior to the date it contracted therefor in September 1940 becomes obvious in view of the fact that, in spite of its apparent awareness of the availability of those facilities, it renewed for 2 years the lease on its own warehouse in 1939 and contracted with at least two other newsprint suppliers prior to said date. It is worthy of note that when petitioner did contract to warehouse the Times-Herald newsprint it did so not with that newspaper but with its supplier, Montmorency Paper Company, Ltd. We note, too, that petitioner did not *desire* to use the Times-Herald as a source of earnings during the base period because of the period of transition then being experienced by the paper. Petitioner's president testified that the surplus space resulting from the acquisition of the Southern Railway warehouse was acquired to provide a "margin of safety" in case a shortage of newsprint developed. We believe this was the real use for which the increased warehouse space was intended. It is difficult to reconcile such intended

use thereof with the contention that the space was intended to produce a higher level of earnings through its use in storing the newsprint of an additional customer.

We, therefore, conclude that the petitioner has not established a change in the character of its business resulting in an increased capacity for production and operation.

Petitioner also claims qualification to reconstruct its average base period net income because it began business in the base period. We have found as a fact that petitioner began business in the base period. It is, therefore, entitled to use a reconstruction of its average base period net income in computing its excess profits tax for the taxable years involved. In so doing it must establish what would be a fair and just amount representing normal earnings for its base period. In its reconstruction of average base period net income it is limited to facts and circumstances existing prior to January 1, 1940, for we have found there was no commitment during the base period to a course of action consummated subsequent thereto resulting in an increased capacity for production and operation. In other words, petitioner is limited on reconstruction to the Post and News experience during the 2 months of its operation prior to January 1, 1940. Petitioner has submitted only one exhibit relative to actual base period income and expenses, which purports to be a statement of income and expenses for the 2 months ending December 31, 1939.

Petitioner's statement of income and expenses for the 2 months ended December 31, 1939, is as follows:

November and December 1939 [1]

Tons of newsprint delivered, 493.

| Income: | Amount | Per ton delivered |
|---|---|---|
| Freight forwarding | $492. 51 | $0. 999 |
| Stevedoring | 1, 659. 74 | 3. 367 |
| Storage | 1, 422. 13 | 2. 884 |
| Agency fees | 100. 00 | . 203 |
| Cash discount taken | _____ | _____ |
| Other income | _____ | _____ |
| Total income | $3, 674. 38 | $7. 453 |
| Expenses: | | |
| Office payroll | $80. 00 | $0. 162 |
| Salaries and wages | 1, 218. 38 | 2. 471 |
| Rent (warehouse) | _____ | _____ |
| Rent (equipment hire) | _____ | _____ |
| Repairs | _____ | _____ |
| Interest | 490. 69 | . 996 |
| Taxes, other than income | 411. 85 | . 836 |

[1] Results for November and December 1939 are based on book figures by months as to income and certain expenses, and on an allocation by months on the best available information as to certain expenses.

| | Amount | Per ton delivered |
|---|---|---|
| Depreciation | $367. 56 | $0. 746 |
| Gas, oil, grease | 22. 66 | . 046 |
| Warehouse expense | 72. 47 | . 147 |
| Damage to newsprint | ———— | ———— |
| Insurance | 215. 41 | . 435 |
| Heat, light, water, power | 15. 55 | . 032 |
| Miscellaneous delivery expense | 68. 40 | . 139 |
| Freight and express | ———— | ———— |
| Office and general expense | 39. 25 | . 080 |
| Total expenses | $3, 002. 22 | $6. 090 |
| Net income, before income taxes | $672. 16 | $1. 363 |
| Less state income tax | 20. 16 | . 041 |
| Net income, before Federal income taxes | $652. 00 | $1. 322 |

In its reconstruction of average base period income, petitioner discloses that the following items of expense are arrived at from no other source than its actual experience during its fiscal years ending June 30, 1940, June 30, 1941, and June 30, 1942: Office payroll, salaries and wages, repairs, advertising and promotion, gas, oil and grease, tires and batteries, warehouse expense, damage to newsprint, insurance, heat, light, water, power, miscellaneous delivery expense, demurrage, freight and express, office and general expense. Total expense for each item for each of said fiscal years has been applied to total actual tons of newsprint handled in said years. Thereby petitioner has arrived at the average cost per ton of each item. In the reconstruction this cost per ton for each item has been applied to the tons of newsprint actually used by the Post, News, and Times-Herald, assuming such tonnage to have been delivered by petitioner. By this process petitioner has, in large part, computed its total constructive cost per ton assumed delivered. It has used the same cost per ton delivered to reconstruct total reconstructed expense. The above-noted expense items constitute, in amount, more than 73 per cent of the total reconstructed expense. Except for that part of petitioner's computation of expense which may be considered as based upon its experience prior to January 1, 1940, we find its reconstruction of its cost of doing business to be violative of section 722 (a).

Petitioner having received its first shipment of newsprint as late as November 1939 and having made its first deliveries in December 1939, it is obvious that its base period is an inadequate standard whereby to determine average base period net income. The submitted reconstruction of average base period net income is based upon the business of all three newspapers hereinbefore referred to. We have found that the business of the Times-Herald may not be taken

into consideration in petitioner's reconstruction. We therefore limit our reconstruction to the business of the Post and News. It is also obvious that petitioner had not attained its normal level of income by December 31, 1939, and it is, therefore, entitled to application of the push-back rule. In other words, we "push back" the facts and circumstances affecting petitioner existing as of December 31, 1939. These facts and circumstances include the existence of its contract with the Post and its acquisition of the business of the News based upon the terms of the same contract. Also "pushed back" is the fact that petitioner did not reach its normal level of deliveries until May of 1940. On that basis we find it is reasonable to conclude that beginning June 1, 1937, petitioner would have received, warehoused, and delivered all of the newsprint used by the Post and News had petitioner begun business 2 years prior to December 31, 1939. Petitioner asks us to determine the sum of $17,922 to be a just and reasonable amount representing its average base period net income. In arriving at this figure it has reconstructed expenses upon a basis which we have determined is contrary to section 722 (a). However, it is obvious to us, and it is undisputed on this record, that post-base period expenses of petitioner, as in virtually all businesses during the years here involved, were proportionately much greater than the expenses of doing business during the base period. We therefore find the *amount* arrived at in petitioner's reconstructed cost of doing business to be a fair and just amount with respect to such cost. We do not, by so finding, approve the taking into account of post-December 31, 1939, events and circumstances affecting such cost. We accept the amount of cost only because such amount is without doubt higher than the *actual* base period cost of doing business. In determining reconstructive income petitioner has assumed that it has received, warehoused, and delivered all of the newsprint used by all three referred to newspapers and has deducted the aforesaid cost of doing business. Our conclusion is that except for petitioner's inclusion of the business of the Times-Herald its reconstruction of average base period gross income results in a fair and just amount as such income is based on the contract with the Post entered into prior to December 31, 1939, and is therefore not violative of the limitations of section 722 (a). We have, therefore, reduced the amount petitioner has reconstructed as its average base period net income by an amount representing income derived from Times-Herald business. We have arrived at the figure of $11,000 which we find to be a fair and just amount representing average base period net income of the petitioner.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*