SIMPLICITY MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 40765. Filed May 13, 1960.

*Richard D. Hobbet, Esq.*, and *Eric W. Passmore, Esq.*, for the petitioner.
*Julian L. Berman, Esq.*, for the respondent.

169

170

172

174

OPINION.

HARRON, *Judge:* It is undisputed that petitioner is a taxpayer who is entitled to use the excess profits credit based on income, and that its manufacture of the conventional garden tractor in 1937, a new product, constituted a change in the character of its business during the base period within the meaning of section 722(b)(4) of the 1939 Code.[1]

In 1939, petitioner obtained a release by Montgomery Ward from the restrictive provision in the 3-year contract whereby petitioner became free to develop its own dealer organization and to sell through its dealers its garden tractors and attachments under its own brand name in the United States, in addition to selling them to Montgomery Ward. Late in 1940, petitioner began the manufacture of the Cultimower, the all-purpose, quick-hitch garden tractor, and new attachments. Also, late in 1940, petitioner began the production of electric fence controllers. The petitioner contends that its average base period net income is an inadequate standard of earnings. Its contention is based upon two premises, as follows:

(1) The first premise relates to petitioner's manufacture and sale of garden tractors. With respect thereto, petitioner relies upon the 2-year push-back rule contained in the second sentence of section 722(b)(4)[2] and claims (a) that it shall be deemed that it obtained the right to sell garden tractors in the United States under its own brand name through its own dealers and distributors 2 years before Montgomery Ward actually agreed to release petitioner from the exclusive restriction in its contract; and (b) that since the development of the Cultimower and the new attachments was one which clearly would have been expected to result from peti-

---

[1] Sec. 722(b). * * * The tax computed under this subchapter * * * shall be considered to be excessive and discriminatory * * *, if its average base period net income is an inadequate standard of normal earnings because—

    *         *         *         *         *         *         *

    (4) the taxpayer, * * * during * * * the base period, * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. * * *

[2] Sec. 722(b)(4). * * * If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time.

tioner's change to the garden tractor business in the ordinary course of such business, it shall be deemed that it would have been manufacturing and selling the Cultimower with such new attachments as the lawnmower, cultivator, and sickle bar 2 years before it actually did, namely in the latter part of 1938.

(2) The second premise relates to petitioner's production of fence controllers, and with respect thereto petitioner relies upon the commitment rule contained in the fourth sentence of (b)(4),[3] contending that prior to January 1, 1940, it was committed to a course of action which resulted in the production of the fence controllers, which constituted a change in its capacity for production.

Finally, petitioner contends that it has established that $131,885.33 would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period for the purpose of section 722(a).

The respondent's position is, briefly, as follows:

By virtue of the change in character of petitioner's business in 1937, represented by its manufacture of the conventional garden tractors and attachments, petitioner is entitled to assume that the change took place 2 years earlier. The respondent does not seriously dispute petitioner's contention that the development of the Cultimower, and new attachments, was a development which clearly would have been expected to result from the change to the garden tractor business, in the ordinary course of business. Accordingly, respondent does not seriously resist petitioner's claim that it is entitled to reconstruct Cultimower tractor sales in 1939.

However, the respondent argues that there was not a commitment prior to January 1, 1940, with respect to the fence controllers. Therefore, the petitioner is not entitled to apply the 2-year pushback rule to the fence controllers in its attempt to reconstruct its base period net income.

Moreover, the respondent argues that the removal late in 1939 of Montgomery Ward's restriction on petitioner, to sell only to it in the United States, did not constitute a change in petitioner's capacity for production or operation, and even if it did, petitioner cannot derive any relief from this factor because if it were assumed that the restriction had been removed 2 years earlier, it would have resulted in either no additional sales or very small sales in 1939.

---

[3] Sec. 722(b)(4). * * * Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business, * * *

Respondent contends, further, that petitioner has failed to establish validly a reconstruction of base period net income in the amount claimed, or in any amount which will provide a larger excess profits credit than has been allowed, and, therefore, some relief. In this respect, the respondent points out that if it is held that the petitioner is not entitled to reconstruct sales of and profits from fence controllers, then petitioner must remove about $30,000, attributed to that product, from its reconstruction. In addition, the respondent contends that for reasons set forth hereinafter, petitioner's reconstruction is faulty and without foundation in respect to its elimination of an average amount of $66,000 of officers' commissions from expenses, and its elimination of the $12,800 loss on the riding tractors. Respondent asserts that petitioner's reconstruction of its unit sales of tractors, of unit prices of tractors, and of the percentage of profit from such sales are inflated and invalid. Under his criticism of petitioner's reconstruction of base period net income, it is the respondent's view (as we understand it) that the maximum amount which petitioner can validly reconstruct for its 1939 income (before making adjustments for the earlier years by use of an index) is around $8,500, which amount will not yield larger excess profits income credits for the excess profits years involved here than have been allowed.

The issues to be decided are clear. The mere existence of a change in the character of business within (b)(4) is not enough to entitle petitioner to relief under section 722. "Petitioner must also prove that, because of such change, its actual average base period net income does not reflect the normal operation during the base period of the business as changed, and it must also establish a fair and just amount representing normal base period earnings for the changed business." *Studio Theatre, Inc.*, 18 T.C. 548, 566. Furthermore, in the last analysis, petitioner must prove and establish a constructive average base period net income of such size as to produce larger excess profits credits than have been allowed without the benefit of section 722. *Green Spring Dairy, Inc.*, 18 T.C. 217, 237.

Petitioner is entitled to reconstruct for all developments which clearly would have been expected to result from the change in the character of petitioner's business in the usual course of business under base period conditions. The record shows that if petitioner had commenced manufacturing garden tractors 2 years earlier, in 1935, it would have made and sold the all-purpose, quick-hitch garden tractor (the Cultimower) and the new attachments for that tractor by 1939. Forrest V. Donald had conceived the idea of an all-purpose tractor with front-hitch attachments which would mow grass and cut weeds, as well as use a cultivator for a small garden,

before petitioner and Montgomery Ward entered into their 1937 agreement. Donald believed that a demand for such tractor would be found readily and he had discussed his idea with Montgomery Ward. It was interested, and it was strongly in favor of petitioner's employing Donald so that he might develop his project. · In its contract with Montgomery Ward (paragraph 5), petitioner agreed to make improvements and adopt progressive developments in the method of designing and manufacturing garden tractors and attachments. It was part of petitioner's early negotiations with Donald that he would work on developing his design of a new-type garden tractor with front attachments. In spite of Montgomery Ward's insistence upon Donald's development of the riding tractor, which proved to be a failure, Donald completed the designing and engineering work on the Cultimower in 1939, and we are satisfied that such work would have been completed earlier, in 1938, but for the delays occasioned by demands of Montgomery Ward. We think it is clear that the Cultimower was developed in the normal course of developing petitioner's garden tractor business and would have been produced 2 years earlier if the change in the character of petitioner's business had occurred 2 years before the change took place. Cf. *Stonhard Co.*, 13 T.C. 790. Petitioner is entitled to reconstruct Cultimower sales in 1939.

With respect to the removal late in 1939 of Montgomery Ward's restriction upon petitioner's sales through its own dealers in the domestic market, we think it may be assumed in this case that such release, opening another source of sales to petitioner, constituted a qualifying change under (b) (4). *Irwin B. Schwabe Co.*, 12 T.C. 606, 615.

The next question is whether there was a change in petitioner's capacity for production after January 1, 1940, as a result of a commitment prior to January 1, 1940, with respect to the production of fence controllers.

Petitioner's conversion in 1940 of part of a floor of its plant to facilities for the production of fence controllers represented a change in capacity for production. Petitioner converted unused space in its building into a production department with workbenches, test benches, some laboratory facilities, and other arrangements which enlarged its productive operations, constituted "a difference in the capacity for production or operation" within the meaning of section 722(b) (4). Respondent does not question this aspect of the issue. See Regs. 112, sec. 35.722–3(d) (3). The more difficult question is whether the petitioner was committed to such change in 1939 within the meaning of (b) (4).

The record shows that the following steps were taken in 1940 which led to petitioner's installation in its building of a production

division for assembling fence controllers in the latter part of 1940:

(1) On February 26, 1940, petitioner's president advised Montgomery Ward in writing about the features of the Klumb fence controller, which it said it could manufacture and sell. No prices were quoted.

(2) Thereafter, there were discussions between B. A. Kaefer of Montgomery Ward and Niederkorn, in which Ira Jones participated.

(3) Petitioner's first written offer to supply Montgomery Ward with four models of controllers at a stated price, each, for each type was made in a letter dated March 6, 1940, to Kaefer; and this was a proposal inviting acceptance by Montgomery Ward. The prices stated in the offer were $9 for the deluxe a.c. electric current set; $9 for the deluxe battery set; $5.50 for the standard battery set; and $4.50 for the special battery set, each price without a battery. In this letter, petitioner also advised Montgomery Ward as follows:

It is important to us that we have your early decision on this proposal so that we can proceed, without delay, with the engineering and redesigning of the various units and submit our lowest prices.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

P.S. We have arranged to ship you a Battery Set for your test and approval.

(4) About one month later, petitioner sent a letter dated April 4, 1940, to Kaefer saying that it had completed its "cost figures," and submitting a list of revised prices for five models as follows: $9.40 for the deluxe a.c. electric current set having contact operation; $9.25 for the deluxe d.c. electric current set having continuous operation; $8.25 for the deluxe battery set with a flasher; $5.20 for the standard battery set with a flasher; and $4.15 for the special battery set without a flasher, each price without a battery. Again, Montgomery Ward's decision was requested.

(5) On April 19, 1940, R. S. Stevens, manager, sent a letter to petitioner stating that he had reviewed the proposals of March 6 and April 4; that Montgomery Ward would be interested at the start in only three models; that eight specifications should be met by petitioner, including a guarantee; that petitioner should submit samples of the products by September 1 for listing in the spring of 1941 catalog; and that "at the time samples of the finished products are received and O.K.'d in line with the above, we will place blanket order with you for our estimated 1941 requirements."

(6) Petitioner, on April 23, 1940, gave Montgomery Ward's Stevens a written acceptance of his proposals and conditions of April 19.

(7) On April 23, 1940, Klumb entered into his first written agreement licensing Jones to grant a license to anyone to make and sell

the Klumb fence controllers; for the first time Klumb's royalties were fixed; for the first time Simplicity was mentioned in a written license agreement as a licensee; and failure of Simplicity to obtain "the Montgomery Ward business for the year 1941 by the first day of October, 1940" was stated to be a condition for terminating Klumb's agreement with Jones. Prior to April 23, 1940, Klumb had not given Jones any written license to license petitioner or any other firm or person to make, use, and sell the Klumb fence controllers, the written agreement of October 16, 1939, having been limited to an assignment and sale to Jones of a one-fifth interest in royalties which might be derived from the sale or licensing to others of Klumb's two patent applications in the future, no mention having been made of the amounts of Klumb's royalties or of any particular licensee.

(8) On July 5, 1940, Brook Stevens' office completed a drawing of a case for a model "C" fence controller to be made of 16-gauge auto-body steel, enameled.

(9) In July 1940, petitioner hired Klumb, as an employee in petitioner's shop, to work on fence controllers.

(10) On September 15, 1940, Montgomery Ward gave petitioner a blanket order for the purchase of 14,060 fence controllers, valued at $106,718.20, to cover Montgomery Ward's requirements from December 1940 through July 31, 1941, to conform to the specifications contained in its letter to petitioner of April 19, 1940. The order was signed by Kaefer. It covered various quantities of four models at the following prices, each: $9.95 for the deluxe a.c. electric current set; $9.05 for the deluxe d.c. electric current set; $5.65 for the "master" battery set; and $4.85 for the "standard" battery set.

(11) On October 29, 1940, Klumb and Jones terminated "all previous agreements" and entered into a new agreement whereby Klumb granted Jones "the sole and exclusive right and license to make, have made, use and sell" Klumb's fence controller inventions; and the only royalty to be paid to Klumb was fixed at a stated amount for the sale of every "high line" controller and at a total minimum figure per year. In this agreement it was stated that Jones contemplated licensing Simplicity, and that Simplicity contemplated manufacturing three battery-operated and one high line (electric line) operated controllers, A, B, C, and D, the battery-operated controllers being not patented.

(12) On November 1, 1940, Jones executed with Simplicity the first written license agreement whereby Jones granted Simplicity an exclusive license to make, have made, use, and sell any and all of Klumb's inventions in electric fence controllers, it being under-

stood that Simplicity contemplated making at least four models, A, B, C, and D (as described in Jones' agreement of October 29, 1940, with Klumb), and Simplicity agreed to pay Jones 5 per cent of its net sales.

The above facts show that as of February 26, 1940, petitioner was attempting to interest Montgomery Ward in considering buying electric fence controllers from petitioner by suggesting that it could furnish a better product at a lower price than Montgomery Ward was then obtaining from Northern Signal; that as of the above date, Klumb had not granted to Jones or petitioner a license to make, have made, use, and sell his fence controllers; that Montgomery Ward did not commit itself until April 19, 1940, to give petitioner a blanket order for controllers; and that it was not until April 23, 1940, that a contract came into existence whereby petitioner bound itself to make for and sell to Montgomery Ward the controllers, and that Klumb gave Jones a license to make and have made the controllers, upon the condition that Simplicity was to receive a sublicense and would obtain a contract from Montgomery Ward not later than October 1, 1940.

Petitioner's claim, that it was committed in the latter part of 1939 to a course of action which was consummated after December 31, 1939, and which resulted in a change in its capacity for production or operation, is based upon the following allegations and assertions with respect to what petitioner purportedly did before December 31, 1939; that it had commenced in 1938 to look for additional new products and volume of sales when it became evident that the sales of garden tractors were not as large as anticipated and desired; that it had expressed willingness in 1939 to Jones to make the fence controllers provided it could sell them to Montgomery Ward; that Jones orally had assured Niederkorn "in such manner as was considered a definite commitment" that petitioner would receive an exclusive license to manufacture, if petitioner were able to obtain a contract from Montgomery Ward; that Niederkorn began in 1939 "negotiating" with R. S. Stevens and Bernard Cook of Montgomery Ward for a contract; and that in 1939, petitioner contracted with Brook Stevens to have him design cases for the fence controllers for a lump sum of $750 for the completed job of making the design.

There are no items of written proof in support of the allegations of petitioner about what allegedly transpired in the latter part of 1939. Petitioner, with respect to such assertions, relies wholly on the testimony of Niederkorn, Jones, and Brook Stevens.

Petitioner's theory about an oral agreement in 1939 with Jones is well described in some of Jones' testimony which is to the fol-

lowing effect: That Jones and Niederkorn, in the latter part of 1939, had a tentative understanding that if Montgomery Ward would be interested in having Simplicity manufacture the electric fence controller, Simplicity would be interested in acquiring the license to make and sell the Klumb fence controller; that the best deal Jones could make at the time with Klumb was the agreement with him dated October 16, 1939; and that after that agreement with Klumb was made, Jones and Niederkorn had a gentlemen's agreement that Simplicity would "derive a license under the umbrella or cover of" the October 16, 1939, agreement between Jones and Klumb.

Niederkorn testified that in 1939 he told Jones "that Simplicity would make an agreement with him and Mr. Klumb to manufacture the electric fence controller of Klumb providing Montgomery Ward and Company would purchase it after we had submitted samples."

Cook, who was called by petitioner to testify about the garden tractors arrangements of Montgomery Ward, was not asked by petitioner to give any testimony about the fence controller negotiations of Montgomery Ward; and R. S. Stevens was not called to give any testimony and no explanation was given for not calling him. There is nothing in the record to corroborate or substantiate Niederkorn's testimony that he had discussions in 1939 with Cook and R. S. Stevens of Montgomery Ward about the Klumb fence controllers, and that in 1939 they requested Niederkorn to submit samples of the controllers with prices. The unexplained absence of testimony of Stevens and Cook suggests that their testimony would not have been favorable to petitioner. *Wichita Terminal Elevator Co.* v. *Commissioner*, 162 F. 2d 513. It must be recognized that Niederkorn was testifying from his recollection of circumstances in 1939, over 17 years before the trial of this case, and that his memory may have been less than precise and accurate in fixing his first discussions with Stevens and Cook as having taken place in the latter part of 1939 rather than soon after January 1, 1940. We are unable to give Niederkorn's uncorroborated testimony on this matter as much weight as petitioner desires. Furthermore, there is nothing in the record to explain why petitioner did not send a letter to Montgomery Ward before February 26, 1940, covering the same generalities if, in fact, petitioner had spoken to Stevens and Cook in 1939 about the fence controllers. As far as Jones and Klumb were concerned, the same sort of generalities as were contained in the letter of February 26, 1940, could have been written to Montgomery Ward before December 31, 1939, and the fact that no such letter was written in 1939 to Montgomery Ward suggests that there may not have been any serious conversations in 1939, or none at all, with

Stevens and Cook. For example, if Niederkorn's recollection placing his first conversations with the above men in 1939 were accurate, there is no apparent reason why he would have delayed until February 26, 1940, to write to Montgomery Ward, there being nothing at all specific about the fence controllers, or making them, or pricing them in the February 16, 1940, letter.

Another effort of petitioner to support its claim that there was a commitment in 1939, is the alleged hiring of Brook Stevens and his firm of designers in 1939 to design a case for the controllers, but, again, there is little or no basis in the record which would support a finding that such arrangement with Brook Stevens was made in 1939. Stevens testified that Niederkorn and Klumb came to his office in October 1939 to engage him to prepare engineering designs for a fence controller case and that Niederkorn was desirous of having this work done in connection with working out estimates of production costs in preparation for giving Montgomery Ward price quotations. Stevens stated that his design work could have extended over 6 months to the point of completion. However, Stevens testified entirely from his recollection and did not refresh his memory by referring to any office records, although he was given an opportunity to do so. He admitted that he and his assistants had been doing design work for the petitioner on garden tractors in 1939. Klumb, on the other hand, testified that the first time he met Niederkorn was in February 1940, when he took a fence controller to petitioner's office to give Niederkorn a demonstration of its operation and to discuss costs; and that the first time he met Brook Stevens was in July 1940, after Klumb accepted employment at petitioner's plant. Klumb was asked if he had gone to Stevens' office with Niederkorn in 1939, and his answer was that he did not recall having done so. Niederkorn testified that he first contacted Stevens in the fall of 1939 about designing a case for a fence controller, but, again, he relied solely upon his recollection, and when asked how much time would be required to develop sample models of a fence controller unit before prices could be quoted to Montgomery Ward, his reply was, at least 90 days.

We are not satisfied that Brook Stevens and his office did any substantial work in 1939 on designing cases and estimating production costs for petitioner. The record shows that his office completed a drawing of a metal case on July 5, 1940. It appears that the 6 months' work which he estimated would be required may well have been done in the first 6 months of 1940, or that even if he gave Niederkorn some advice late in 1939, that probably did not involve any substantial amount of work at that time.

Klumb's testimony is in conflict with that of Stevens and Niederkorn. Klumb testified that he had made models of fence controllers

in his shop at home; that the first time he saw Niederkorn was in the early spring of 1940, around February; that at that time there was a superficial discussion about production costs; and that he went to work for petitioner in the middle of July 1940 for the purpose of further developing battery-operated models and to assist in preparations for the production of fence controllers. There was no cross-examination of Klumb.

The petitioner did not quote any prices for fence controllers until March 6, 1940, which was after having conferences with representatives of Montgomery Ward; as of April 4, 1940, petitioner revised its first price quotations; and by April 19, 1940, it was the understanding of Montgomery Ward that petitioner's prices would be no higher than those submitted in its letter of April 4, and that petitioner's prices "must be competitive with other quotations" which Montgomery Ward might receive on comparable fence controller units.

Upon consideration of all of the evidence on this point, particularly Niederkorn's testimony that it would take about 3 months to prepare costs of controller units and prices to be quoted to Montgomery Ward, it appears that such work may have been and was begun by petitioner and its officers after December 31, 1939. Petitioner's substantially final quotations of prices were completed around the first of April 1940. On the whole, there is no convincing proof that petitioner began any work before December 31, 1939, in any substantial way for fence controller production; it did not make any changes in its plant facilities preparatory to arranging for production until around July 1940.

Decision of the question does not depend upon whether or not petitioner could have withdrawn from its considerations about producing fence controllers prior to January 1, 1940, without substantial detriment to itself. Rather, the question is whether petitioner, before January 1, 1940, had made a substantial change in its position toward effecting the change in capacity, and had *unequivocally established the intent to make the change within a reasonable period of time.*

Upon the facts and circumstances, it is concluded that at the end of 1939 the petitioner was not committed to a course of action to increase its capacity for production or operation by the creation of facilities to produce fence controllers, which arrangements were made in 1940. Petitioner did not spend any money in 1939. All of its expenditures were made in 1940, when it paid Brook Stevens $750 in October and $5,000 for converting space to a division for fence controller production, which apparently was done after Montgomery Ward had agreed in April to purchase controllers. Prior

to the end of 1939, petitioner had only a promotion idea for soliciting Montgomery Ward's fence controller business which, if obtained, would lead to its going into fence controller production in 1940. Prior to January 1, 1940, petitioner did not take any course of action or make any definitive change in position which unequivocally established a commitment actually to enlarge its production facilities at any particular time, if ever, for assembling fence controllers, or which unequivocally established an intent to make fence controllers within any particular time.

The discussions in 1939 between Niederkorn and Jones directly related to Niederkorn's first "selling" the idea of the superiority of the Klumb fence controllers to Montgomery Ward. Only if and when Niederkorn succeeded in that undertaking would petitioner receive a license to make them and commence to change its productive capacity. Niederkorn did not obtain any promise from Montgomery Ward in 1939 to buy the Klumb controllers, and the record does not establish that any substantial advancement in that direction was made in 1939. Petitioner was not interested in making them for any other distributor or buyer. At the end of 1939, the possibility of petitioner's expanding its facilities for fence controller production was contingent and remote. Petitioner's intention to make a change in production facilities within a reasonable period of time was not unequivocal but was conditional and open to doubt prior to January 1, 1940.

It has been observed that a taxpayer's failure to make a contract during the base period for a change in capacity is not necessarily conclusive of the question of commitment, *Studio Theatre, Inc.*, *supra*, p. 565; *Columbia Broadcasting System, Inc. of California*, 32 T.C. 39, 42, provided there is proof that some definitive course of action was taken before 1940 through which the taxpayer changed its position so considerably as to have unequivocally committed itself to make the change in capacity for production. As we pointed out in *Robinson Terminal Warehouse Corporation*, 19 T.C. 1185, 1191, "something more than hope, desire, and expectation is needed to demonstrate a commitment under section 722(b)(4). A definite plan, together with action taken on the strength of such plan, must be shown." Such was not done in this case before 1940.

The circumstances and conditions here are comparable to the situations of the taxpayers in the following cases where it was held that a commitment within the meaning of (b)(4) had not been established. See *Copco Steel & Engineering Co.*, 31 T.C. 629, 637-638; *Lansburgh & Bro.*, 30 T.C. 1114; *Barth Smelting Corporation*, 30 T.C. 1073, 1078; *Peter J. Schweitzer, Inc.*, 30 T.C. 42, 60; *Continental Folding Paper Box Co.*, 17 T.C. 984, 993.

196

The instant case is distinguishable on its facts from *Springfield Tablet Manufacturing Co.*, 22 T.C. 35; *Beringer Bros., Inc.* 18 T.C. 615; and *7-Up Fort Worth Co.*, 8 T.C. 52.

The introduction of the conventional garden tractor in 1937 constituted a change in the character of petitioner's business. The development of the all-purpose, quick-hitch garden tractor in 1939 was a development which was a normal outgrowth and closely associated with the change in character and so may be treated as accompanying that change. *Peter J. Schweitzer, Jr., supra* at 65. The removal in 1939 of Montgomery Ward's restriction against selling garden tractors through petitioner's own dealers may be assumed here to have indicated a difference in capacity. *Irwin B. Schwabe Co., supra.* With respect to these qualifying changes, petitioner has attempted a reconstruction of its base period income under the push-back rule. The next inquiry is whether these changes in character, if they had been made 2 years earlier, would have resulted in more earnings under the economic and other conditions as they existed during the base period. *Green Spring Dairy, Inc., supra.*

The petitioner must show that its average base period net income was an inadequate standard of normal earnings for the entire base period because of the changes, and it must reconstruct an average base period net income in order to establish a fair and just amount representing normal earnings to be used as a constructive average base period net income. It must establish, also, a reconstructed average base period net income in a large enough amount to obtain reconstructed excess profits income credits which will exceed the actual credits available without the benefit of section 722. Cf. *Atlas Foundry Co.*, 31 T.C. 623, 628.

In the base period years, the petitioner realized a profit in 1936 in the amount of $285.25, and it sustained losses in the other 3 years as follows: A loss of $19,864.60 in 1937; $9,953.57 in 1938; and $25,196.29 in 1939. For the base period, petitioner's average loss was $13,682.20. In order to establish any relief, petitioner must establish a constructive average base period net income which will convert the actual average base period loss to amounts which will provide some relief. One question is whether a sufficiently higher level of earnings would have been experienced if the changes in character in petitioner's business had occurred 2 years before they took place.

In its reconstruction. petitioner proposes to increase 1939 sales of garden tractors and attachments from actual net sales of $168,949 to $739,022; and to reconstruct the gross profit from such sales from $48,476 to $184,755. Such reconstruction would increase average

monthly sales of garden tractors and attachments from $12,000 to $61,000. After a careful consideration of all of the evidence, we are of the opinion that the maximum net sales of garden tractors and attachments petitioner could have made during 1939, under the base period economy and conditions under which petitioner was operating, could not have reached $739,022. Cf. *Orange Roller Bearing Co.*, 33 T.C. 1082.

Actually, petitioner sustained the largest amount of loss (in the base period) in 1939. In that year, the riding tractor (which Montgomery Ward had urged petitioner to produce) had been a failure and had caused a loss to petitioner of $12,800. Furthermore, the failure of the riding tractor had had an adverse effect on the sales of the conventional garden tractors. In the normal course of petitioner's business with Montgomery Ward, it would have insisted upon the production and trial of the riding tractor even if petitioner had started the initial production of garden tractors 2 years sooner than in fact was done. It must be assumed, in applying the push-back rule, that with the production of the riding tractor 2 years earlier, and the failure thereof, there would have been the same adverse effect upon the sales of the other type of tractors. It follows, therefore, that in a reconstruction of net earnings the failure of the riding tractor, under the base period conditions, is a factor which must be taken into account as a depressing influence upon sales of garden tractors. Whatever might have an adverse effect upon Montgomery Ward's sales likewise would adversely affect the volume of petitioner's production and sales to Montgomery Ward. Petitioner's reconstruction of sales of garden tractors for 1939 does not, in our opinion, properly take into account the riding tractor failure, as a factor, in applying the push-back rule.

We believe that petitioner's reconstruction is in error in other respects, as follows: Petitioner's reconstruction of sales to its own domestic dealers under the push-back rule is without foundation. Petitioner has not established that dealer sales can be reconstructed to a larger amount than the actual export sales in 1939. Also, it is incorrect to apply the push-back rule to the officers' commissions of 10 per cent. Upon the record, we do not believe that if petitioner's change in the character of its business, the making of garden tractors, had started 2 years earlier, its business would have reached such level of earnings in 1937, 1938, and 1939 that officers' commissions would have been abandoned. Petitioner has not proved that by 1937 the conditions which supported its paying commissions to Niederkorn and the other officers would have been overcome. It is incorrect to assume that this expense would have been eliminated in 1939, or before, in applying the 2-year push-back rule.

Another error in petitioner's reconstruction is found in the opinions of its witnesses with respect to reconstruction of sales of garden tractors. The introduction of garden tractors into petitioner's business did not in fact result in a substantial increase in its earnings. Cf. *Lamar Creamery Co.*, 8 T.C. 928. The opinions of petitioner's witnesses about a reconstruction of the volume of sales of garden tractors apparently were based upon petitioner's book figures for sales of tractors in 1939 which were 2,381 units, plus attachments. However, the actual deliveries in 1939 were only 1,450 units. Furthermore, petitioner has failed to show a pattern of steady growth in the production and sales of garden tractors which would indicate that if the garden tractors had been produced 2 years earlier than they were actually produced for the first time, petitioner would have reached in 1939 a reconstructed production of 7,510 units as was assumed by petitioner's witnesses in their reconstruction of garden tractor sales and attachments for 1939 of $739,022.

We have concluded that petitioner was not committed to a change in capacity for production, with respect to the fence controllers, prior to January 1, 1940. Petitioner's reconstruction of an average base period net income in the amount of $131,885.33, includes reconstructed net earnings from fence controllers under the push-back rule in the amount of about $30,000. That amount must be eliminated from the proposed reconstruction, which reduces it to about $101,885.

Upon a thorough and careful consideration of the entire record, we are not convinced that if the change in the character of petitioner's business had occurred 2 years sooner, there would have been a substantial increase in petitioner's earnings during the base period years. Cf. *Barth Smelting Corporation, supra* at 1079; *Michael Schiavone & Sons, Inc.*, 27 T.C. 497; *Orange Roller Bearing Co., supra.* While assumptions and opinions must be used in reconstructing earnings, such assumptions must have a sound foundation associated with known facts. *Yeast Products, Inc.*, 21 T.C. 308; *Avey Drilling Machine Co.*, 16 T.C. 1281; *D. L. Auld Co.*, 17 T.C. 1199.

In view of petitioner's persistent record of losses, we are unable, on the record before us, to arrive at any CABPNI in an amount which would produce excess profits credits larger than are available to petitioner without the benefit of section 722. Moreover, the record does not justify and support petitioner's proposed CABPNI of either $131,885, or even about $101,885. We find it impossible, upon the record, to find that petitioner could properly assume in its proposed CABPNI a profit ratio of 25 per cent, and that its reconstructed sales of garden tractors for 1939 would amount to $739,022, or anywhere

near that amount. It follows and we so hold and find that petitioner is not entitled to any relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*